# IN THE SUPREME COURT OF IOWA

No. 13–0450

Filed January 2, 2015

Amended June 9, 2015

**STATE OF IOWA,**

>   Appellee,

vs.

**KEVIN DESHAY AMBROSE,**

>   Appellant.

---

Appeal from the Iowa District Court for Black Hawk County, Todd A. Geer, Judge.

Defendant appeals convictions and sentences for murder in the first degree, attempt to commit murder, and felon in possession of a firearm and challenges instructions to the jury. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, Vidhya K. Reddy, Assistant Appellate Defender, and Kevin D. Ambrose, pro se, for appellant.

Thomas J. Miller, Attorney General, Mary A. Triick, Assistant Attorney General, Thomas J. Ferguson, County Attorney, James J. Katcher and Linda M. Fangman, Assistant County Attorneys, for appellee.

**CADY, Chief Justice.**

In this appeal from a conviction for murder in the first degree and other criminal offenses, we consider claims of trial error based primarily on jury instructions relating to the order in which the jury was instructed to consider greater and lesser offenses and various permissible inferences of malice. On our review, we conclude the acquittal-first instruction was not prejudicial, and the inference instructions were not erroneous. We affirm the judgment and sentence of the district court.

## I. Background Facts and Proceedings.

This case arises from a shooting that occurred on May 2, 2012, at a house in Waterloo shared by Kevin Ambrose and Marlene Buss. They lived in the house with two of Buss's three children, Ambrose's two children, and Ambrose's brother, Jeremi Montgomery. Ambrose and Buss had dated earlier in their lives and reconnected in 2010. They began living together in 2011. Their relationship included discussions of marriage. They obtained and framed an unsigned marriage certificate, purchased wedding rings, and discussed having children together.

At the same time, the relationship between Ambrose and Buss was strained and involved both physical and verbal confrontations. Buss was also concerned that Ambrose had personal relationships with other women. Ambrose would leave the house for days without contacting Buss. Buss also feared that Ambrose could be violent. Ambrose once told Buss he would kill her if she ever left him.

On May 1, Buss spent the evening with Undray Reed, the father of two of her children, following his release from prison. During the evening, they discussed their children, and Buss told Reed of the problems in her relationship with Ambrose. Buss returned to the house

around 6 a.m. on May 2. When Ambrose returned home a few hours later, he threatened "to do something to" Buss once he found out where she had been.

Later in the morning, Buss left the house with her two children because she was afraid of Ambrose. She went to the home of Reed's sister. That afternoon, she obtained a no-contact order against Ambrose. The order also directed Ambrose to vacate the house. The order was served on Ambrose at the house by two deputy sheriffs at 5:20 p.m. The deputies remained in the house until Ambrose collected a few personal belongings and left. Ambrose's children remained at the house in the care of Montgomery.

After Ambrose left the house, the deputies contacted Buss and told her she could return to the residence. Buss returned, but she also planned to vacate the house because she feared a conflict with Ambrose would arise despite the no-contact order. She was accompanied by her mother, Kay Straw. Reed, his sister, his daughter, and Reed and Buss's two children also went to the house. They all planned to help Buss gather her belongings.

Shortly after Ambrose vacated the house, he made a phone call to Leslie Kingery, the mother of his two children, and asked her to retrieve some of his belongings from the house, as well as some clothing for his children. She went to the house with two of Ambrose's aunts, but was not permitted to remove any property by Buss and a police officer called in to assist. Kingery then left with her children and Ambrose's aunts. Around the same time, at 5:54 p.m., Ambrose made a phone call to Jodi Sherburne and told her, "[I]f something happens, please remember that I love you and [your daughter]." After the phone call ended, Sherburne called Buss to express concern for her safety. Ambrose called Sherburne

again at 6:04 p.m. He was upset and told her, "I got to go do what I got to go do."

Kingery called Ambrose at 6:19 p.m. and told him she was unable to retrieve any property from the house. Montgomery then called Ambrose from the house at 6:25 p.m. This call lasted seventeen minutes. During the call, the police returned to the house three more times after Montgomery and Buss started to argue over property Buss wanted to remove from the house, including a sofa. After Montgomery refused to allow Buss to remove the sofa and after the law enforcement officers had left the house, she began to repeatedly cut the sofa with a kitchen knife.

Around this time, Ambrose returned to the house by entering through the side door. He was carrying a pistol and a baseball bat. As he entered, he observed the framed marriage license in a trash can. He then saw Reed standing in the living room. Ambrose approached him until he was only a few feet away and pointed the pistol at his forehead. He said, "You first" and pulled the trigger. The firing mechanism of the pistol jammed, and the pistol did not fire. Buss began to run out the front door, as Ambrose worked to dislodge the bullet that had jammed in the pistol. Ambrose then pursued Buss out the front door and shot her in the back as she was descending the front steps. She fell to the ground. Ambrose then stood over her and shot her two more times, once in the abdomen and once in the buttock as she tried to shield herself from the attack. She then managed to stand up and run. As she was retreating from the house, she used her cell phone to call 911. This call was made at 6:51 p.m.

After wounding Buss, Ambrose entered the front door of the house and shot Straw twice before exiting the side door. Straw was struck by

bullets in the back and in the chest. Ambrose jumped over Straw as he ran out the side door to pursue Reed, who had run from the house.

Ambrose pursued, but was unable to catch up to Reed, and disappeared from the scene. Between 6:55 p.m. and 7 p.m., Ambrose called Sherburne seven times. He asked her to pick him up in her car and told her he had done something stupid. He also called Kingery, told her that he loved her and the kids and that it was "too late." Ambrose called Kingery again the next morning after hiding from law enforcement officers overnight. He told her there had been an altercation at the house the night before, and he had blacked out. Police took Ambrose into custody on May 3.

Straw was pronounced dead after being transported to a hospital. Buss survived her injuries.

Ambrose was charged with murder in the first degree in violation of Iowa Code section 707.2, two counts of attempt to commit murder in violation of section 707.11, and felon in possession of a firearm in violation of section 724.26. At trial, he argued that Straw's death was manslaughter, not murder, because he was overwhelmed by a sudden passion caused by the day's events after he entered the house on May 2 just prior to the shooting.

Ambrose objected to a variety of jury instructions at trial. First, he objected to Instruction No. 53. This instruction told the jury it could "[c]onsider lesser included offenses of a count only if you unanimously find the defendant not guilty of the offense charged." Second, he objected to Instruction No. 38. This instruction told the jury, "You may but are not required to infer malice from the commission of Burglary in the First Degree which results in death, or Attempt to Commit Murder which results in death." Third, Ambrose objected to Instruction No. 39.

This instruction told the jury, "You may but are not required to infer malice aforethought from the defendant's use of a dangerous weapon."

The district court instructed the jury on other inferences and conclusions the jury was permitted to draw, which Ambrose did not lodge any objection to at the time. First, Instruction No. 14 told the jury, "You may, but are not required to, conclude a person intends the natural results of his or her acts" in deciding whether a person intended to do an act against the law. Second, Instruction No. 15 told the jury, "You may, but are not required to, conclude a person intends the natural results of his or her acts" in determining specific intent. Finally, Instruction No. 37 told the jury, "If a person has the opportunity to deliberate and uses a dangerous weapon against another resulting in death, you may, but are not required to, infer that the weapon was used with malice, premeditation and specific intent to kill."

Ambrose was convicted of all four counts and sentenced to life in prison without the possibility of parole for the murder. He was sentenced to twenty-five years for each of the two counts of attempt to commit murder, and five years for the count of felon in possession of a firearm.

Ambrose appealed. He raises three claims. First, he asserts Instruction No. 53—the jury may not consider a lesser offense unless it unanimously found him not guilty of the greater offense—was a misstatement of the law because it precludes a fair consideration and discussion by the jury of the lesser included offenses. Second, he argues the instructions concerning the various inferences and conclusions the jury was permitted to draw were improper because they amounted to undue comment on the evidence. To the extent that his attorney did not object to all of the inference instructions, Ambrose claims he was denied

effective assistance of counsel. Finally, he contends the trial court never had jurisdiction over the case because the two counts of attempt to commit murder in the trial information failed to describe a criminal offense.

## II. Scope of Review.

"We review challenges to jury instructions for correction of errors at law." *State v. Frei*, 831 N.W.2d 70, 73 (Iowa 2013); *see also* Iowa R. App. P. 6.907. "Error in jury instructions is reversible only if the error is prejudicial." *Condon Auto Sales & Serv., Inc. v. Crick*, 604 N.W.2d 587, 593 (Iowa 1999). "Errors in jury instructions are presumed prejudicial unless 'the record affirmatively establishes there was no prejudice.'" *Asher v. Ob-Gyn Specialists, P.C.*, 846 N.W.2d 492, 496 (Iowa 2014) (quoting *State v. Murray*, 796 N.W.2d 907, 908 (Iowa 2011)).

To the extent error is not preserved on an issue, any objections must be raised within an ineffective-assistance-of-counsel framework. *See State v. Fountain*, 786 N.W.2d 260, 263 (Iowa 2010) ("Ineffective-assistance-of-counsel claims are an exception to the traditional error preservation rules."). Claims of ineffective assistance of counsel are reviewed de novo. *King v. State*, 797 N.W.2d 565, 570 (Iowa 2011).

## III. Error Predicated on Acquittal—First Instruction.

We first consider the claim of error based on instruction to the jury that it could not consider a lesser included offense until it found Ambrose not guilty of the greater offense. The State claims Ambrose failed to preserve error on this issue. Therefore, we first consider if error was preserved.

**A. Preservation of Error.** In determining whether Ambrose preserved error in this case, we begin by considering the rationale underlying our error-preservation rules. We have previously summarized

the importance of our error-preservation rules and the underlying principles that support them as follows:

> Error preservation is important for two reasons: (1) affording the district court an " 'opportunity to avoid or correct error' "; and (2) providing the appellate court " 'with an adequate record in reviewing errors purportedly committed' " by the district court. These principles of error preservation are based on fairness:
>
>> "[I]t is fundamentally unfair to fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider. Furthermore, it is unfair to allow a party to choose to remain silent in the trial court in the face of error, taking a chance on a favorable outcome, and subsequently assert error on appeal if the outcome in the trial court is unfavorable."

*State v. Pickett,* 671 N.W.2d 866, 869 (Iowa 2003) (citation omitted) (quoting *DeVoss v. State,* 648 N.W.2d 56, 60 (Iowa 2002)).

In this case, Ambrose initially objected to Instruction No. 53 on the basis that it was unnecessary because the order of the marshaling instructions would adequately guide the jury to consider each count by beginning with the greater offense. The prosecutor responded that the instruction was necessary because it told the jury it needed to unanimously decide the greater offense before considering a lesser offense. Thus, the purpose and effect of the instruction were clearly identified by the prosecutor. Nevertheless, Ambrose responded that the general instruction to the jury that they could only convict him of the degree of crime of which there was no reasonable doubt made Instruction No. 53 "redundant." Ambrose then concluded his objection by arguing the instruction was "duplicative and not necessary."

The objection made at trial by Ambrose failed to give the trial court an opportunity to correct the error he now claims on appeal. Ambrose never alerted the trial court that the instruction constituted a misstatement of the law by precluding any consideration of a lesser

offense until the jury acquitted the defendant of the greater offense. Moreover, the district court rejected the claim that the instruction was duplicative by concluding it would help the jury sort through the charging instructions. The district court never had an opportunity to consider the underlying legal merits of not allowing the jury to consider a lesser offense until the defendant was acquitted of the greater offense.

We conclude Ambrose failed to preserve error on this issue. Thus, we proceed to consider the claim under an ineffective-assistance-of-counsel framework. *See State v. Ross*, 845 N.W.2d 692, 698 (Iowa 2014) (" '[F]ailure to recognize an erroneous [jury] instruction and preserve error breaches an essential duty.' " (quoting *State v. Ondayog*, 722 N.W.2d 778, 785 (Iowa 2006))).

**B. Ineffective Assistance of Counsel.** "The right to assistance of counsel under the Sixth Amendment to the United States Constitution and article I, section 10 of the Iowa Constitution is the right to 'effective' assistance of counsel." *Fountain*, 786 N.W.2d at 265 (quoting *Ondayog*, 722 N.W.2d at 784). To establish an ineffective-assistance-of-counsel claim, an applicant must show that "(1) his trial counsel failed to perform an essential duty, and (2) this failure resulted in prejudice." *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 693 (1984)). The claimant must prove each of these elements by a preponderance of the evidence. *King*, 797 N.W.2d at 571.

We can resolve ineffective-assistance-of-counsel claims under either prong of the analysis. *State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003). With respect to the application of the first prong to this case, we have never addressed the question of whether a jury in a criminal case must decide a defendant's guilt or innocence on the greater offense

before considering a lesser offense. We recognize the question has been addressed by other courts across the nation, with a variety of outcomes.[1]

_____

[1]A number of jurisdictions have reached a variety of outcomes when considering how the jury should be instructed to move from considering the charged offense to considering lesser included offenses. *See* David F. Abele, Comment, *Jury Deliberations and the Lesser Included Offense Rule: Getting the Courts Back in Step*, 23 U.C. Davis L. Rev. 375, 379–80 & nn.28–33 (1990) [hereinafter Abele] (compiling cases); Robert Sheppard, Comment, *Double Jeopardy Blues: Why in Light of* Blueford v. Arkansas *States Should Mandate Partial Verdicts in Acquit-First Transition Instruction Cases*, 83 Miss. L.J. 373, 379–81 & nn.20–27 (2014) [hereinafter Sheppard] (noting the different approaches to "transition instructions" and compiling cases). The different approaches include: (1) acquittal-first instruction; (2) unable-to-agree instruction; (3) defendant's choice between acquit-first and unable-to-agree instructions; (4) has-not-been-proved instruction; (5) the court allows the jury to consider the charged offense and the lesser included offenses together, in whatever order it wishes; and (6) no transition instruction. Sheppard, 83 Miss. L.J. at 379–81 & nn.22–27.

In jurisdictions that utilize an acquittal-first transition instruction, the judge instructs the jury to "begin by deliberating the greatest charge first, proceed from one charge to the next in descending order based on severity, and proceed to discussing the lesser charges only after the jury unanimously agrees to acquit the defendant of the greater charge." *Id.* at 379.

While the caselaw from the majority of states suggests an acquittal-first instruction is an acceptable choice for the district court to utilize when charging a jury, cases from Georgia, New Jersey, Nebraska, and New Hampshire suggest murder/provocation cases need special treatment. *Edge v. State*, 414 S.E.2d 463, 465–66 (Ga. 1992) (finding an acquittal-first felony-murder instruction precludes consideration of provocation evidence); *State v. Trice*, 835 N.W.2d 667, 671–72 (Neb. 2013) (same with second-degree murder); *State v. O'Leary*, 903 A.2d 997, 1000–01 (N.H. 2006) (holding a pure acquittal-first instruction when manslaughter is a lesser included offense is error); *State v. Coyle*, 574 A.2d 951, 966 (N.J. 1990) (holding sequential charges can be misleading in murder cases). Commentators have also noted a movement away from the acquittal-first approach. Abele, 23 U.C. Davis L. Rev. at 377–78, 381 (citing seven states that had moved to a disagreement or "unable to agree" instruction between 1977 and 1989)).

Under an unable-to-agree instruction,

jurors may render a verdict on a lesser-included offense if, after full and careful consideration of the evidence, they are unable to reach agreement with respect to the charged crime. Thus, the jury may deliberate on a lesser offense if it either (1) finds the defendant not guilty on the greater charge, or (2) after reasonable efforts cannot agree whether to acquit or convict on that charge.

*State v. LeBlanc*, 924 P.2d 441, 442 (Ariz. 1996).

Some courts have chosen to allow the defendant to make the choice between the acquittal-first and the unable-to-agree instructions. The United States Court of Appeals for the Second Circuit made that decision in *United States v. Tsanas* premised on the

Nevertheless, we can resolve this case under the prejudice prong of an ineffective-assistance-of-counsel claim. Therefore, it is unnecessary for us to consider if trial counsel rendered ineffective assistance by failing to argue that the acquittal-first instruction was an improper statement of the law.

To establish prejudice in the context of an ineffective-assistance-of-counsel claim, a defendant must show a reasonable probability that the result of the trial would have been different. *King*, 797 N.W.2d at 574. The likelihood of a different result must be substantial, not just conceivable. *Id.* at 572. A defendant must show the probability of a different result is sufficient to undermine confidence in the outcome. *State v. Clay*, 824 N.W.2d 488, 496 (Iowa 2012). This standard requires us to consider the totality of the evidence, identify what factual findings

---

belief that, "[w]ith the opposing considerations [of the acquittal-first and unable-to-decide instructions] thus balanced," it could not conclude that "either form of instruction is wrong as a matter of law." 572 F.2d 340, 346 (2d Cir. 1978). Therefore, the court concluded that "[t]he court may give the one that it prefers if the defendant expresses no choice," but if the defendant has a preference, "the court should give the form of instruction which the defendant seasonably elects." *Id.* The court reasoned the defendant should be the one to choose because it is the defendant's "liberty that is at stake," whereas the government's risk is limited to the defendant's "readier conviction for a lesser rather than a greater crime." *Id.* While far from the majority, some jurisdictions have followed the *Tsanas* court's reasoning and elect to allow the defendant to choose the type of instruction given to the jury. *See, e.g.*, *United States v. Jackson*, 726 F.2d 1466, 1469 (9th Cir. 1984) (per curiam); *Catches v. United States*, 582 F.2d 453, 459 (8th Cir. 1978); *Wright v. United States*, 588 A.2d 260, 262 (D.C. 1991); *State v. Powell*, 608 A.2d 45, 47 (Vt. 1992).

The has-not-been-proved instruction provides that rather than require an acquittal, if an element of the charge is not proved beyond a reasonable doubt, then the jury is to move to the lesser charge. *State v. Thomas*, 533 N.E.2d 286, 293 (Ohio 1988). Some courts "allow[ ] jurors to deliberate on greater and lesser offenses in any order but prohibit[ ] return of verdicts on lesser offenses without first returning a verdict on the greater offense." *Whiteaker v. State*, 808 P.2d 270, 274 (Alaska Ct. App. 1991). And, finally, some states do not require any specific transition instruction be used by their courts. Sheppard, 83 Miss. L.J. at 381 & n.27.

would have been affected, and determine if the error was pervasive or isolated and trivial. *Everett v. State*, 789 N.W.2d 151, 158 (Iowa 2010).

The general justification for permitting a jury to consider lesser included offenses without first acquitting the defendant on the greater offense is to insure that the jury fully appreciates and understands the alternative outcomes at stake and how all the claims of the parties fit into those alternatives. *See State v. Labanowski*, 816 P.2d 26, 33–36 (Wash. 1991) (discussing different rules before deciding the unable-to-agree instruction accurately reflects Washington law). In this case, the claim of provocation is directed at the lesser offense of voluntary manslaughter. Ambrose claims the jury would have likely found him guilty of manslaughter if they would have had the opportunity to consider the lesser included offense specifically directed at provocation.[2]

Provocation is the linchpin of the crime of voluntary manslaughter. Iowa Code § 707.4 (2011). We recently discussed the concept of serious provocation in *State v. Thompson*, 836 N.W.2d 470, 477 (Iowa 2013). We said:

> "The subjective requirement of section 707.4 is that the defendant must act solely as a result of sudden, violent, and irresistible passion. The sudden, violent, and irresistible passion must result from serious provocation sufficient to excite such passion in a reasonable person. This is an objective requirement. It is also necessary, as a final objective requirement, that there is not an interval between

---

[2]A person commits voluntary manslaughter when that person causes the death of another person, under circumstances which would otherwise be murder, if the person causing the death acts solely as the result of sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a person and there is not an interval between the provocation and the killing in which a person of ordinary reason and temperament would regain control and suppress the impulse to kill.

Iowa Code § 707.4 (2011).

the provocation and the killing in which a person of ordinary reason and temperament would regain his or her control and suppress the impulse to kill."

*Thompson*, 836 N.W.2d at 477 (quoting *State v. Inger*, 292 N.W.2d 119, 122 (Iowa 1980)).  In *Thompson*, we held a trial court did not err in failing to give a voluntary manslaughter instruction based on evidence that the victim slapped the defendant, argued with him, and made an obscene gesture before he shot her twice in the head after she had retreated to a car parked in the driveway of their home.  *Id.* at 475, 478.  The defendant testified he retrieved his rifle and shot her because he could not "take it anymore."  *Id.* at 475.

In this case, evidence of serious provocation was based on the observations made by Ambrose after he entered the house, as well as his emotional state after he was removed from the house by the no-contact order and was unable to obtain clothing for his children from the house. The observations made by Ambrose after he entered the house to support provocation included the sight of the framed marriage license in a trash can, damage to a sofa, and the presence of Reed in the house.

The claim of provocation was undermined by ample evidence that Ambrose planned to engage in some form of extreme violence before going to the home.  He armed himself with a pistol and a baseball bat before going to the house, and attempted to fire the pistol at a person promptly after entering the house and announcing, "You first."  *See State v. Holder*, 237 Iowa 72, 81, 20 N.W.2d 909, 914 (1945) (holding " 'the provocation must be great . . . to lower the offense' . . . if . . . the defendant armed himself for the encounter" (quoting *State v. Hockett*, 70 Iowa 442, 453, 30 N.W. 746, 748 (1886))).  Thus, despite the subjective claim by Ambrose that the events upon entering the house flamed an

irresistible passion that provoked the shootings, there was strong objective evidence of premeditation.

Additionally, the evidence of provocation was insufficient to excite sudden, violent, and irresistible passion in a reasonable person. Like *Thompson*, the evidence in this case emanated from a historically troubled relationship, and under all the circumstances, was insufficient to constitute serious provocation under an objective standard. *See Thompson*, 836 N.W.2d at 477–78. Furthermore, there was no evidence that the murder victim did anything to provoke Ambrose to shoot her. *See Inger*, 292 N.W.2d at 122 (recognizing that evidence the victim assaulted the defendant could establish serious provocation).

Considering all the evidence, there was no reasonable probability the result of the trial would have been different if the jury could have considered the lesser included offenses before deciding Ambrose was guilty of the greater offenses of murder in the first degree and the two counts of attempt to commit murder. The evidence of guilt was overwhelming, and the jury would have necessarily considered the evidence of provocation when considering the state of mind of Ambrose to support the crimes of murder and attempt to commit murder. The district court had read all the instructions to the jury before deliberations began, so the jury would have known of the provocation element of voluntary manslaughter when it considered the greater offense of murder in the first degree. Furthermore, the arguments of counsel informed the jury of the claim of provocation. Overall, our confidence in the outcome of the trial is not undermined by the acquittal-first instruction under all the circumstances in this case.

## IV. Error Predicated on Inference Instructions.

We next address the claim by Ambrose that the inference instructions given to the jury by the district court constituted an improper comment on the evidence. Ambrose did not object to all of the inference instructions at trial. To the extent that an objection was not lodged at trial, Ambrose claims he was denied effective assistance of counsel. Of course, if the inference instructions were a correct statement of the law and did not improperly comment on the evidence, no error occurred at trial, and the claim of ineffective assistance of counsel fails. *See State v. Maxwell*, 743 N.W.2d 185, 197 (Iowa 2008).

We begin by recognizing that the five instructions at issue are generally supported by the law of this state, although not necessarily directly. *See State v. Blair*, 347 N.W.2d 416, 421 (Iowa 1984) ("The use of a deadly weapon accompanied by an opportunity to deliberate is evidence of malice, deliberation, premeditation and intent to kill."); *State v. Oliver*, 341 N.W.2d 744, 747 (Iowa 1983) ("Malice may be inferred . . . from the commission of a felony that results in death."); *State v. Rinehart*, 283 N.W.2d 319, 322–23 (Iowa 1979) (holding as rational an inference that a person intends the natural and probable consequences that result from their actions); *State v. Smith*, 242 N.W.2d 320, 326 (Iowa 1976) (stating malice aforethought may be inferred from the use of a deadly weapon). The instructions in dispute are also part of the Iowa State Bar Association's Criminal Jury Instructions. *See* Iowa State Bar Ass'n, Iowa Criminal Jury Instructions 700.8 (2010) ("If a person has the opportunity to deliberate and uses a dangerous weapon against another resulting in death, you may, but are not required to, infer that the weapon was used with malice, premeditation and specific intent to kill."); *id.* 700.9 ("Malice may be inferred from the commission of (felony) which results in death.");

*id.* 700.10 ("Malice aforethought may be inferred from the defendant's use of a dangerous weapon."); *id.* 200.1–.2 ("You may, but are not required to, conclude a person intends the natural results of [his] . . . acts."). Normally, we are slow to disapprove of the uniform jury instructions. *State v. Weaver*, 405 N.W.2d 852, 855 (Iowa 1987); *see also State v. Beets*, 528 N.W.2d 521, 523 (Iowa 1995) (per curiam).

Nevertheless, Ambrose urges us to reconsider the instructions on the basis that they constitute an improper comment on the evidence. He argues that the inference instructions unfairly draw attention to the evidence and can be viewed as a judicial comment on the evidence. He asserts that the inferences to be drawn from the evidence should be left for counsel's argument.

Generally, the five instructions at issue can be considered together because the claim of error is basically the same with each instruction. The undue-comment argument rests in part on the basic legal proposition that malice may be inferred from all the circumstances of the case. *See State v. Copenhaver*, 844 N.W.2d 442, 452 (Iowa 2014) ("We may infer intent from the defendant's actions and the circumstances of the transaction."); *State v. Bentley*, 757 N.W.2d 257, 265 (Iowa 2008) (approving malice instruction). This proposition is not disputed by Ambrose. Yet, once a jury is informed that malice may be inferred from all the facts and circumstances, Ambrose claims that more specific instructions that authorize malice to be inferred from specifically identified circumstances or acts in the case only draw attention to that evidence and may even allow the jury to find malice based on evidence that otherwise would not support the inference. Professor Rigg provides an illustration of this latter point in his Iowa practice treatise on criminal law by using the inference of malice based on the use of a dangerous

weapon. 4 Robert R. Rigg, *Iowa Practice Series™ Criminal Law* § 3:5, at 87–88 (2014–2015 ed.). He explained:

> A is involved in a fight with B. A is winning the fight and has knocked B to the ground. B picks up a rock and strikes A. A dies as a result of being st[r]uck with the rock. B is charged with murder. The rock is argued to be a dangerous weapon because it is an instrument which is used in a manner as to indicate the defendant intends to inflict death or serious injury and is capable of inflicting death or serious injury. Using the inference instruction, the prosecution is free to argue and the jury to conclude that B was acting with "malice aforethought" even though there is no evidence of spite, hatred or ill will.

*Id.* (footnote omitted). Under this illustration, if an instrumentality used to cause death would not normally be used to cause death and the jury is instructed it can infer malice from the use of the instrument, the jury could draw an inference from the mere use of the instrument even though the actual surrounding evidence would not otherwise support malice. *Id.* Thus, the instruction could be used by the jury as a substitute for a finding of malice based on the evidence. *See id.* § 3:5, at 88–89; *id.* § 3:13, at 96–97.

While the argument articulated by Ambrose in this case against the use of inference instructions generates concerns that must be carefully considered in each case, the danger identified by Professor Rigg is not present in this case. Here, Ambrose entered the house in violation of a no-contact order, and he was armed with a baseball bat and a pistol, which he repeatedly fired at occupants in the house, as well as one occupant outside the house who was attempting to run from the dwelling. Each of the inference instructions were justified by the circumstances in the case and did not present a danger that the jury could infer malice from underlying acts identified in the instruction that would not otherwise support the inference.

We have permitted the practice of instructing juries on inferences of malice from certain evidence since 1858. *See State v. Gillick*, 7 Iowa 287, 311 (1858) ("Malice is legitimately inferred from the weapon used; and where the killing is with a dangerous weapon, calculated to produce, and actually producing death, in the absence of proof that it was accidental, or upon provocation, the presumption of law is, that the act was voluntary, and with malice aforethought."). Inferences are a part of our law and the practice of identifying specific inferences that may be drawn from general categories of evidence gives the jury an important focal point and tightens the analysis to eliminate inferences not supported by the evidence.

We acknowledge that repetitive instructions may give undue prominence to certain evidence. *Burkhalter v. Burkhalter*, 841 N.W.2d 93, 106 (Iowa 2013). However, an instruction is not repetitive if it serves to clarify a concept or build on a point of law for the jury. *Id.* at 107. Here, the district court was required to instruct the jury on all lesser included offenses to each count. *See State v. Anderson*, 636 N.W.2d 26, 38 (Iowa 2001) ("Generally, a district court commits reversible error by failing to instruct the jury on all lesser-included offenses."). In this context, the three malice inference instructions were not repetitive, but each corresponded with an instruction on a specific offense. The first instructed on permissible inferences in willful, deliberate, premeditated first-degree murder with specific intent to kill the victim. The next provided the permissible inferences that may be drawn in a forcible felony death. The third malice instruction provided the inferences for second-degree murder malice aforethought. The trial court must walk a fine line between instructing the jury on all the necessary lesser included offenses and avoiding a piling-on effect that unduly emphasizes certain

aspects of the evidence. In this case, however, each malice inference instruction included a distinct point of law and applied to a different offense. The inference instructions did not constitute reversible error.

### V. Subject Matter Jurisdiction.

Finally, Ambrose challenges the subject matter jurisdiction of the district court for the first time on appeal. This pro se challenge is based on his claim that the two counts of attempt to commit murder set out in the trial information did not adequately describe a crime under Iowa Code section 707.11. He does not claim the trial information failed to provide adequate notice and opportunity to prepare a defense. Instead, he asserts no criminal offense was described to give the trial court subject matter jurisdiction of the case.

Subject matter jurisdiction can be raised at any time. *State v. Oetken*, 613 N.W.2d 679, 686 (Iowa 2000). However, the trial information in this case adequately described the proceeding as a criminal case, which is the type of case the district court has jurisdiction to hear and decide. *See State v. Yodprasit*, 564 N.W.2d 383, 386 (Iowa 1997) (citing Iowa Constitution art. V, § 6); *State v. Mandicino*, 509 N.W.2d 481, 482–83 (Iowa 1993). Ambrose impliedly acknowledged the criminal nature of the proceeding and the charges against him by failing to challenge any deficiency or uncertainty in the charges prior to trial. *See State v. Davis*, 581 N.W.2d 614, 616 (Iowa 1998) (citing Iowa R. Crim. P. [2.11(2)(b)]) (recognizing complaints over the sufficiency of charges need to be raised prior to trial); *State v. Hobson*, 284 N.W.2d 239, 241 (Iowa 1979) (same). The district court had subject matter jurisdiction.

**VI.  Conclusion.**

We have reviewed all claims of error raised on appeal.  We affirm the judgment and sentence of the district court.

**AFFIRMED.**

All justices concur except Wiggins and Appel, JJ., who concur specially, and Waterman, J., who concurs specially.

**WIGGINS, Justice (concurring specially).**

I concur in the majority's decision. I agree with the majority's analysis regarding the jury instruction that the jury could not consider a lesser included offense until it found Ambrose not guilty of the greater offense.

I also agree with the majority's proposition "that the five instructions at issue are generally supported by the law of this state, although not necessarily directly." I also agree the inference instructions corresponded to the offense charged and the lessor included offenses. I part way with the majority because the district court failed to tie the appropriate inference instruction to the applicable crime.

> We have said
>
> an instruction embodying a potential comment on the evidence does not warrant reversal unless the instruction prejudiced the complaining party. Prejudice results when the trial court's instruction materially misstates the law, confuses or misleads the jury, or is unduly emphasized.

*Anderson v. Webster City Cmty. Sch. Dist.*, 620 N.W.2d 263, 267–68 (Iowa 2000) (citations omitted).

In this case, the instruction telling the jury malice may be inferred from the commission of a felony which results in death, only applies to the felony-murder instruction. *See State v. Oliver*, 341 N.W.2d 744, 747 (Iowa 1983). Yet the court did not limit that inference to the felony-murder instruction. For this reason, I would find that instructing the jury without referencing an instruction to a specific charge not only misstates the law, but it also confuses, misleads, and unduly emphasizes the State's argument to the jury. Under other circumstances, I could not

be sure the jury did not use this instruction to infer malice in one of the lessor included offenses.

However, I find this error to be harmless because the jury found Ambrose guilty of first-degree murder. Thus, the jury did not use the instruction inferring malice from the commission of a crime to find malice in the lessor included charges. In the future, I would require any inference instruction to reference the applicable element of the crime. In addition, I would not give some of the inference instructions that are duplicative. The court does not have to give an instruction just because it appears in the Iowa State Bar Association's instruction manual. The court must guarantee defendants a fair trial and not overemphasize the State's case.

I also disagree with the statement that "[n]ormally, we are slow to disapprove of the uniform jury instructions." First, we do not have "uniform jury instructions" approved by our court. A committee of the Iowa State Bar Association writes the instructions. The president of the bar association appoints the committee members. We do not have any oversight over the process. Second, we never intended the bar association's instructions to have a presumption of correctness. As we said in a resolution regarding the instructions,

> Under Iowa law any jury instructions might be challenged in the usual manner on appeal to this court. That right of review on the part of future litigants precludes us from considering the Plain English Redraft Instructions for official approval or disapproval. We nevertheless note this newest contribution of the committee with a deep sense of appreciation and satisfaction.

Iowa Supreme Ct. Resolution, *In the Matter of the Iowa State Bar Association Uniform Court Instruction Committee* (May 6, 1987).

As the Supreme Court of the State of Iowa, we cannot delegate our duty to insure the instructions our courts give to our juries correctly state the law. Although the bar association does a great service to the trial courts of this state by publishing its jury instructions, the trial court has a duty to make sure the instruction conforms with Iowa law. Accordingly, I would overrule any caselaw that gives these instructions a presumption of correctness.

Appel, J., joins this special concurrence.

**WATERMAN**, **Justice (concurring specially).**

I join in the well-reasoned majority decision in all respects. I write separately to respond to the special concurrence that gratuitously denigrates the long-standing reliance by the bench and bar on the uniform jury instructions promulgated by the Iowa State Bar Association (ISBA). I disagree with my colleague's assertion that we should "overrule any caselaw that gives these instructions a presumption of correctness." This would include dozens of published decisions of our court and dozens of decisions of our court of appeals. Stare decisis demands greater respect for our precedent.

As our court reiterates today, "we are slow to disapprove of the uniform jury instructions." *See also State v. Beets*, 528 N.W.2d 521, 523 (Iowa 1995); *State v. Weaver*, 405 N.W.2d 852, 855 (Iowa 1987). Indeed, just two years ago, our court, without dissent on this point, stated, " 'trial courts should generally adhere to the uniform instructions.' " *State v. Becker*, 818 N.W.2d 135, 143 (Iowa 2012) (quoting *State v. Mitchell*, 568 N.W.2d 493, 501 (Iowa 1997); *see also State v. Hatter*, 414 N.W.2d 333, 336 (Iowa 1987) (same). Why the change of heart today?

"While we normally approve the submission of uniform instructions," we are free to find a "particular instruction is faulty." *State v. McMullin*, 421 N.W.2d 517, 518 (Iowa 1988). Everyone knows this. What some readers may fail to fully appreciate, however, is the tremendous service the members of the ISBA Jury Instruction Committee do for our justice system. Without the uniform instructions, trial judges and lawyers statewide would be burdened reinventing the wheel researching and drafting ad hoc jury instructions every trial. The variances in the wording of instructions would increase exponentially,

further burdening appellate review. It is far better to have a committee of dedicated trial judges and lawyers craft uniform instructions to spare their colleagues that time and trouble. If an appellate court concludes a particular jury instruction is erroneous, or if our court changes the law in a manner requiring a revision, then corrections to the uniform instruction can be readily made and implemented statewide. The value of our current process is well understood by the bench and bar. It should go without saying.