# In the Iowa Supreme Court

No. 24–0971

Submitted November 13, 2025—Filed February 20, 2026

**State of Iowa,**

Appellee,

vs.

**Sherral Jermaine Tolbert, Jr.,**

Appellant.

Appeal from the Iowa District Court for Scott County, Henry W. Latham II, judge.

A defendant appeals his conviction for second-degree murder, arguing that the district court erred in instructing the jury on voluntary manslaughter. **Affirmed.**

McDermott, J., delivered the opinion of the court, in which all justices joined.

Christopher A. Kragnes, Sr. (argued) of Kragnes & Associates, P.C., Des Moines, for appellant.

Brenna Bird, Attorney General, and David Banta (argued), Assistant Attorney General, for appellee.

**McDermott, Justice.**

Sherral Tolbert and two friends were driving across town to meet some others when he spotted Levonta Baker—a former friend turned rival gang member—driving the opposite direction. Tolbert shouted to his passengers upon seeing Baker and immediately turned around in pursuit. Baker eventually parked along a residential street. In a scene fully captured on a nearby home's security camera, Tolbert pulled up alongside Baker's car, stopping just long enough to aim a handgun at Baker and pull the trigger six times. Baker's injuries were swift and severe, leaving him dead behind the wheel.

The State charged Tolbert with first-degree murder. At trial, he didn't deny shooting and killing Baker. Tolbert argued instead that his actions resulted from intense passion supporting a conviction for only voluntary manslaughter, not murder. According to Tolbert, some months before, Baker had fired on Tolbert's grandmother's house (where Tolbert and other family members were living) in a drive-by shooting. Tolbert claimed that when he drove past Baker, he saw Baker reach down for something—Tolbert knew Baker to carry a gun—as he drove in the direction of Tolbert's grandmother's house. Tolbert testified that he was overcome with emotion upon seeing Baker under the circumstances and shot him in the heat of passion.

The district court's first-degree murder instruction to the jury stated as follows:

> 1. On or about the 25th day of October, 2020, the defendant shot Lavonta Baker.
>
> 2. Lavonta Baker died as a result of being shot.
>
> 3. The defendant acted with malice aforethought.
>
> 4. The defendant acted willfully, deliberately, premeditatedly and with a specific intent to kill Lavonta Baker.

After listing these elements, the instruction then directed the jury on what to do next:

> If the State has proved all of the elements, the defendant is guilty of Murder in the First Degree. If the State has failed to prove any one of the elements, the defendant is not guilty of Murder in the First Degree and you will then consider the charge of Murder in the Second Degree explained in Instruction No. 30.

Jury Instruction No. 30, the instruction for second-degree murder, was identical to the first-degree murder instruction except that it had only three elements, omitting the fourth element requiring the State to prove Tolbert "acted willfully, deliberately, premeditatedly and with a specific intent to kill." The second-degree murder instruction included a similar direction to the jury about what to do next:

> If the State has proved all of the elements, the defendant is guilty of Murder in the Second Degree. If the State has failed to prove any one of the elements, the defendant is not guilty of Murder in the Second Degree and you will then consider the lesser charge of Voluntary Manslaughter, explained in Instruction No. 31.

Jury Instruction No. 31, the instruction for voluntary manslaughter, started with the same two elements as first- and second-degree murder (that Tolbert shot Baker and that Baker died as a result). But its third element was unlike the murder instructions and required the State to prove the following element:

> 3. The shooting was done solely by reason of sudden, violent and irresistible passion resulting from serious provocation.

The voluntary manslaughter instruction concluded with a similar direction to the jury:

> If the State has proved all of the elements, the defendant is guilty of Voluntary Manslaughter. If the State has failed to prove any one of the elements, the defendant is not guilty of Voluntary Manslaughter and you will then consider the lesser charge of

Involuntary Manslaughter by Public Offense, as explained in Instruction No. 33.

Tolbert objected to these instructions, arguing that both murder instructions should have told the jury to go on to consider the lesser included voluntary manslaughter charge *even if* the jury found that the State had proved the elements of first- or second-degree murder. The district court rejected Tolbert's argument and gave the instructions quoted above, which track the uniform instructions prepared by The Iowa State Bar Association. The jury ultimately acquitted Tolbert of first-degree murder but convicted him of second-degree murder.

In this appeal, Tolbert challenges the district court's instructions, along with two other rulings from the trial: the district court's denial of his motion for mistrial when the prosecutor mentioned punishment during jury selection, and its denial of a motion to disqualify a prosecutor in the case based on a conflict of interest allegedly arising from the prosecutor's prior employment with the local public defender's office.

**A. Jury Instructions.** Tolbert argues that the instructions do not properly state the law and, in particular, do not properly convey the statutory definition of voluntary manslaughter. Iowa's voluntary manslaughter statute states as follows:

> A person commits voluntary manslaughter when that person causes the death of another person, *under circumstances which would otherwise be murder,* if the person causing the death acts solely as the result of sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a person and there is not an interval between the provocation and the killing in which a person of ordinary reason and temperament would regain control and suppress the impulse to kill.

Iowa Code § 707.4(1) (2020) (emphasis added).

Tolbert argues that the italicized clause in the definition—"under circumstances which would otherwise be murder"—means that voluntary manslaughter includes all the elements of murder *plus* proof of "sudden, violent, and irresistible passion resulting from serious provocation." Under this view, voluntary manslaughter is not really a lesser included offense of murder, since a lesser included offense generally contains some subset of the elements of a more serious offense and is necessarily committed in carrying out the greater offense. *See State v. Greenland,* 17 N.W.3d 347, 351–52 (Iowa 2025); *see also* Iowa Code § 701.9 (describing merger of lesser included offenses). Tolbert's reading of the manslaughter statute instead makes voluntary manslaughter a form of *mitigation* for first- or second-degree murder.

As he argues it, if the jury finds that a defendant's actions establish all the elements for murder, the jury must then consider whether the killing resulted from a "sudden, violent, and irresistible passion" that would reduce it to voluntary manslaughter. Iowa Code § 707.4(1). If so, the jury must acquit on the murder charge and find guilt on only the voluntary manslaughter charge. Tolbert argues that the jury instructions thus misstated the law because they told the jury that "[i]f the State has proved all of the elements" of one of the murder charges, "the defendant is guilty of Murder," making it impossible for the jury to enter a verdict that tracked the statute's definition of voluntary manslaughter as an act that "would otherwise be murder," *id.*

Tolbert's proposed jury instruction, which the district court rejected, would have preceded the first-degree murder instruction and stated:

> If you determine Mr. Tolbert has committed either Murder in the First Degree as defined in instruction [22] or Murder in the Second Degree as defined in Instruction [30], you must consider Voluntary Manslaughter as defined in Instruction [31] prior to rendering your final verdict.

During the instruction conference at trial, Tolbert requested to change the phrase "you must consider Voluntary Manslaughter" in his proposed instruction to "you may consider Voluntary Manslaughter."

Tolbert's argument runs into several roadblocks. As an initial matter, requiring a jury to find both that the defendant acted with malice *and* in the heat of passion is logically untenable, as the two mental states are mutually exclusive. Other jury instructions—unobjected to by Tolbert—crystallize this point. Jury Instruction No. 24 defines "malice aforethought" as "a fixed purpose or design to do some physical harm to another which exists before the act is committed." The instruction makes clear the distinction between murder's malice element and manslaughter's heat-of-passion element, stating, "Malice requires only such deliberation that would make a person appreciate and understand the nature of the act and its consequences, *as distinguished from* an act done in the heat of passion." (Emphasis added.) *See State v. Newell*, 710 N.W.2d 6, 21 (Iowa 2006) (approving a malice instruction using this language); *State v. Lee*, 494 N.W.2d 706, 707–08 (Iowa 1993) (same). Our cases approving nearly identical jury instructions that make this precise distinction go back a long way. *See, e.g.*, *State v. Gramenz*, 126 N.W.2d 285, 290 (Iowa 1964) (approving a malice instruction that, like the one in this case, "distinguished" malice "from an act done in the heat of passion" (quoting *State v. Hofer*, 28 N.W.2d 475, 482 (Iowa 1947))). Stated simply, we have long settled that acting in the "heat of passion" involves a temporary loss of control sparked by a serious provocation, which is a mental state incompatible with the deliberation that leads to the "fixed purpose" required for malice.

Tolbert cites *State v. Ceretti*, 871 N.W.2d 88 (Iowa 2015), for the proposition that voluntary manslaughter can be committed under circumstances

that would otherwise constitute murder. *Ceretti* centered on whether the crimes of voluntary manslaughter and attempted murder merged. *Id.* at 91. There we said that although *some* manslaughter crimes were committed with an "intent to kill," not all were, and thus "intent to kill" was not a required element that would establish that an attempted murder charge merged with voluntary manslaughter. *Id.* at 93–94. We cited with approval prior cases making clear that malice "is not to be equated with specific intent to kill." *Id.* at 94 (quoting *State v. Smith*, 242 N.W.2d 320, 326 (Iowa 1976)). *Ceretti* did not address whether malice is an element of voluntary manslaughter and thus offers little to aid Tolbert here.

But we did directly address whether malice is an element of voluntary manslaughter in *State v. Taylor*, 452 N.W.2d 605 (Iowa 1990) (en banc). In *Taylor*, a defendant argued that malice aforethought is an element of voluntary manslaughter under § 707.4 and that, in his prosecution for manslaughter, the State failed to prove it, necessitating reversal of his conviction. *Id.* at 606. We rejected this argument, concluding instead that under the statute, "malice is the only ingredient of murder *not* found in voluntary manslaughter." *Id.* (emphasis added). We summarized our interpretation on this point bluntly: "Malice is clearly not an element of voluntary manslaughter under Iowa Code section 707.4." *Id.*

All this said, not all states align on this issue, although differences in statutory language often seem to play a role. In Arkansas, for instance, the crime of manslaughter while under "extreme emotional disturbance" (akin to our manslaughter) is not a lesser included offense of murder because instead of requiring a less culpable mental state, it adds as an element "that the defendant be acting under an extreme emotional disturbance." *Fincham v. State*, 427

S.W.3d 643, 647 (Ark. 2013). But Arkansas's statute differs from Iowa Code § 707.4 in an important way. Arkansas's statute provides that a person commits manslaughter if the killing occurs "under circumstances that would be murder, except that he or she causes the death under the influence of extreme emotional disturbance for which there is reasonable excuse." Ark. Code Ann. § 5-10-104(a)(1)(A) (Supp. 2011). Iowa's statute, by contrast, provides that a person commits voluntary manslaughter under circumstances that "would otherwise be murder, if the person causing the death acts *solely* as the result of sudden, violent, and irresistible passion." Iowa Code § 707.4 (emphasis added). The word "solely" in this phrase suggests that *passion alone* is the culpable mental state for voluntary manslaughter in Iowa. Passion as the sole ingredient leaves no room for malice, which involves "deliberation" that causes someone to "appreciate and understand at the time the act is committed its nature and probable consequences." *State v. Serrato*, 787 N.W.2d 462, 469 (Iowa 2010) (quoting *Gramenz*, 126 N.W.2d at 290).

As we noted in *Taylor*, our interpretation of § 707.4 conforms with the common law understanding of voluntary manslaughter. 452 N.W.2d at 606. The legislature did not enact a statutory definition for voluntary manslaughter until 1976 as part of the Iowa Criminal Code's overhaul. 1976 Iowa Acts ch. 1245 (ch. 1), § 704 (codified at Iowa Code § 707.4 (Supp. 1977)). The common law elements of manslaughter did not include malice. In *State v. Shipley*, for instance, we held "that [the] defendant could not possibly be prejudiced" by an error in a malice instruction, "as malice is not an element of manslaughter." 146 N.W.2d 266, 271 (Iowa 1966), *overruled in part on other grounds by, State v. Bester*, 167 N.W.2d 705 (Iowa 1969). Similarly, in *State v. Brown*, we stated that "[t]he distinction between murder and manslaughter is that in the latter there is

an absence of malice." 132 N.W. 862, 866 (Iowa 1911). "We interpret statutes consistent with common law unless the language of the statute clearly negates the common law." *State v. Pace,* 602 N.W.2d 764, 771 (Iowa 1999); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 318 (2012). We assume "that even the statutory criminal law is to be administered in accordance with the general principles of right and justice recognized in the common-law system." *State v. O'Neil,* 126 N.W. 454, 456 (Iowa 1910).

Tolbert offers a separate argument that because the court gave what are referred to as "acquittal-first instructions" for the murder charges, the instructions provide no gateway for the jury to properly consider voluntary manslaughter. An acquittal-first instruction directs the jury not to consider a lesser included offense unless it first finds the defendant not guilty of the greater offense. *See State v. Ambrose,* 861 N.W.2d 550, 555 (Iowa 2015). Here, the murder instructions directed the jury to find the defendant guilty if the State proved every element of the greater offense; if not, the jury was told to consider the instruction for the next lesser included offense. Tolbert argues this violated his due process rights under both the State and Federal Constitutions because it prevented the jury from considering voluntary manslaughter once it determined that the State had proved second-degree murder.

Although we have discussed acquittal-first instructions in prior cases, none of our holdings in those cases have turned on their constitutionality. In *State v. Ambrose*, the defendant argued that his lawyer provided ineffective assistance by failing to object to an acquittal-first instruction. *Id.* at 556–59. In a lengthy footnote surveying some of the academic literature and cases from other jurisdictions, we noted that although a handful of states require special

treatment where both murder and provocation are in play, the majority of states deem acquittal-first instructions "an acceptable choice for the district court to utilize when charging a jury." *Id.* at 556 n.1.

We also discussed how some courts allow the defendant to make a choice between an acquittal-first instruction and an "unable-to-agree instruction." *Id.* With an unable-to-agree instruction, the jury "may render a verdict on a lesser-included offense if, after full and careful consideration of the evidence, they are unable to reach agreement with respect to the charged crime." *Id.* (quoting *State v. LeBlanc*, 924 P.2d 441, 442 (Ariz. 1996) (en banc)). In *United States v. Tsanas*, the United States Court of Appeals for the Second Circuit stated that it could not "say that either form of instruction"—acquittal-first or unable-to-agree—"is wrong as a matter of law." 572 F.2d 340, 346 (2d Cir. 1978) (Friendly, J.). As a result, it concluded that the court could give the instruction it prefers if the defendant expresses no preference, but "[i]f he does, the court should give the form of instruction which the defendant seasonably elects" since "[i]t is his liberty that is at stake, and the worst that can happen to the Government under the less rigorous instruction is his readier conviction for a lesser rather than a greater crime." *Id.* We noted in *Ambrose* that "[w]hile far from the majority," some jurisdictions allow the defendant to choose the type of instruction given to the jury, following the *Tsanas* court's reasoning. *Ambrose*, 861 N.W.2d at 556 n.1 (citing cases). But in *Ambrose*, we ultimately didn't need to answer the acquittal-first question, resting our holding instead on the fact that the defendant could not establish the prejudice prong of his ineffective-assistance-of-counsel claim because he lacked evidence of provocation, a necessary ingredient to voluntary manslaughter. *Id.* at 558–59.

Iowa has used acquittal-first instructions for more than a century. In *State v. Leuhrsman,* a case from 1904, we approved instructions that directed if the jury found the defendant guilty, "it should be of the highest of the included offenses of which the evidence showed him guilty beyond a reasonable doubt, but, if there was a reasonable doubt of his guilt of the higher charge, they should then consider the lower degree, and so consider each to the last included crime, if necessary." 99 N.W. 140, 142 (Iowa 1904). Our approach aligns with the majority of jurisdictions, which allow (or, in some instances, affirmatively require) the use of acquittal-first instructions. *See* 6 Wayne R. LaFave et al., *Criminal Procedure* § 24.8(d), at 1008–14 (5th ed. 2025). The Supreme Court of Tennessee has observed that an acquittal-first approach "satisfies the requirement that the jury render its verdicts unanimously," facilitates orderly and thorough deliberations by "[p]resenting the jury with a structure to follow," and "reduces the risk of a compromise verdict." *State v. Davis*, 266 S.W.3d 896, 907–08 (Tenn. 2008). The Supreme Court of Connecticut has made a similar determination, concluding that acquittal-first instructions "preserve and promote the integrity of jury deliberations when greater and lesser included offenses are at issue." *State v. Sawyer*, 630 A.2d 1064, 1074 (Conn. 1993). Other states require acquittal-first instructions by statute and have rejected constitutional challenges to these statutes. *See, e.g., People v. Sattiewhite*, 328 P.3d 1, 27–28 (Cal. 2014) (declining to reconsider its "long-standing rejection of challenges to the 'acquittal first' rule"); *State v. Turnidge*, 374 P.3d 853, 932 (Or. 2016) (holding that any constraint on the manner of jury deliberations by acquittal-first instructions "does not rise to the level of a violation of either the Eighth Amendment or the Due Process Clause of the Fourteenth Amendment").

In contrast to the Second Circuit's approach in *Tsanas*, we will not require district courts to grant the defendant the power to decide whether to give an acquittal-first instruction. The district court is not bound to give any specific form of instruction. *State v. Ellison*, 985 N.W.2d 473, 479 (Iowa 2023). Prejudice results, and reversal is required, "when jury instructions mislead the jury or materially misstate the law." *State v. Benson*, 919 N.W.2d 237, 241–42 (Iowa 2018). An acquittal-first instruction that suffers none of these defects is not erroneous simply because the defendant preferred a different formulation.

Finding no error in the jury instructions, we turn to Tolbert's other arguments on appeal.

**B. Prosecutorial Misconduct.** Tolbert moved for a mistrial after an exchange between the prosecutor and a potential juror during voir dire that he claims rose to the level of prosecutorial misconduct. Tolbert moved for a mistrial, which the district court denied. The exchange in question between the prosecutor and prospective juror went as follows:

> [PROSECUTOR]: Would it surprise you if I anticipate you also hearing an instruction that the jury is not involved in punishment at all?
>
> PROSPECTIVE JUROR: Yes.
>
> [PROSECUTOR]: That would surprise you, or that would not?
>
> PROSPECTIVE JUROR: That would not surprise me.
>
> [PROSECUTOR]: Does that make sense to you?
>
> PROSPECTIVE JUROR: Yes.
>
> [PROSECUTOR]: Can you think of some reasons why that might be the case, why you have nothing to do with punishment?
>
> PROSPECTIVE JUROR: I think that's what the whole process is for. It's not necessarily in my hands.

[PROSECUTOR]: I think that's fair. There is also this idea of consistency. You know, you don't want somebody receiving ten years in prison and somebody else paying a fine because there is a different jury, right?

PROSPECTIVE JUROR: Right.

Tolbert contends that the prosecutor's comments about potential punishments constituted misconduct because they invited the jury to consider sentencing rather than guilt. We review the denial of a motion for mistrial for abuse of discretion. *Kinseth v. Weil-McLain*, 913 N.W.2d 55, 66 (Iowa 2018). Under this standard, "we give a great deal of leeway to the trial judge who must make [a] judgment call." *Newell*, 710 N.W.2d at 20–21. We afford district courts considerable discretion in ruling on motions for mistrial since, by virtue of their presence throughout the trial, they are generally better positioned than appellate courts to gauge the effect the challenged statements had on the jury. *State v. Brown*, 5 N.W.3d 611, 615 (Iowa 2024).

"The jury has no concern with the punishment which the law prescribes. Its function is to determine the fact question as to whether the defendant is guilty or not guilty." *State v. Purcell*, 191 N.W. 849, 850 (Iowa 1923). Using voir dire to ensure prospective jurors accept that their role is separate from punishment is a legitimate inquiry for prosecutors to pursue. But mentioning particular punishments as examples to emphasize the point, and particularly ones that might suggest a range from a fine to ten years' incarceration, risked putting in the jurors' minds components of the very subject—punishment—that the prosecutor seemed aimed to ensure that the jurors avoided. Tolbert argues that mentioning a fine or ten years' imprisonment misled the jury by grossly understating the range of penalties for a conviction.

Although we don't condone how the prosecutor illustrated his point here by mentioning specific punishments, we do not find it sufficiently prejudicial to conclude that the district court abused its discretion in refusing to grant a new trial. To establish reversible error, the defendant must prove that the resulting prejudice rose to the level of a constitutional deprivation of a fair trial. *State v. Coleman*, 907 N.W.2d 124, 140 (Iowa 2018). Jurors know both "that if they find a defendant guilty, he will be punished in some fashion," and "that the more serious the offense of which the defendant is convicted, the more severe the punishment the defendant will receive." *State v. Piper*, 663 N.W.2d 894, 915 (Iowa 2003), *overruled on other grounds by*, *State v. Hanes*, 790 N.W.2d 545 (Iowa 2010). If the jurors' common sense were not enough, we're satisfied that the trial court's Jury Instruction No. 9 prevented any juror misunderstandings by clarifying that "[i]n the event of a guilty verdict, you have nothing to do with punishment." We find no abuse of discretion in the denial of the motion for mistrial based on the single reference to punishments during voir dire.

**C. Conflict of Interest.** Tolbert challenges the district court's finding that the prosecutor had no conflict of interest based on his prior work as an assistant public defender in the same office that, for a short period, had represented Tolbert. In response to Tolbert's motion to disqualify the prosecutor, the district court held a hearing, consistent with *State v. Watson*, 620 N.W.2d 233, 238 (Iowa 2000) (en banc), to gather information about the alleged conflict. Before the *Watson* hearing, the prosecutor filed an affidavit stating that the Davenport public defender's office had been assigned to represent Tolbert in this case on November 18, 2020, but withdrew forty days later, on December 28, because the office had previously represented potential witnesses in the case. The prosecutor's prior work with the Davenport public defender's office overlapped

those forty days. Later, in 2023, he left to become a prosecutor in the Scott County Attorney's Office. The affidavit stated that while working for the public defender's office, the prosecutor "did not receive any information about this case, consult with other public defenders about this case, receive confidential information about this case, meet Mr. Tolbert, or have any involvement in handling the case file."

Although satisfied that there was no risk of prejudice flowing from any personal representation of Tolbert himself by the prosecutor, the district court scheduled a second *Watson* hearing to address the prosecutor's contact with the potential witnesses in Tolbert's case that prompted the public defender's office to withdraw. In response, the prosecutor filed another affidavit stating that although he had had some limited involvement with the potential witnesses, the State did not intend to call any of them. The district court ultimately concluded that the prosecutor had not obtained any confidential information related to the case warranting disqualification, and thus Tolbert would suffer no prejudice from the prosecutor's involvement.

Iowa Rule of Professional Conduct 32:1.9 addresses a lawyer's duties to former clients. The rule provides that when a lawyer has left "a firm" that represents a client, the lawyer may not represent a party "in the same or a substantially related matter" when that party's interests are "materially adverse" and the lawyer possesses confidential information "material to the matter." *Id.* r. 32:1.9(b). As Professor Sisk has summarized the rule, "If the lawyer did not personally participate in a client matter, and did not otherwise acquire confidential information, then even if the lawyer leaves a firm that represents a client on one side of a dispute and joins a firm that represents a client on the other side of that same matter, the lawyer individually has not changed sides."

16 Gregory C. Sisk et al., *Iowa Practice Series: Lawyer and Judicial Ethics* § 5:9(c), at 438 (2025 ed. 2025). Although the definition of "firm" as used in rule 32:1.9 doesn't expressly include a prosecutor's office or public defender's office, *see* Iowa R. of Prof'l Conduct 32:1.0(c), a separate rule generally makes "a lawyer currently serving as a public officer or employee . . . subject to rule[] . . . 32:1.9," *id.* r. 32:1.11(d)(1). *But cf. State v. McKinley*, 860 N.W.2d 874, 888 (Iowa 2015) (Waterman, J., concurring specially) (arguing that a public defender's office is not a "firm" for imputing conflicts of interest under rule 32:1.10).

"A conflict does not exist just because one party asserts it does." *McKinley*, 860 N.W.2d at 880 (majority opinion). Courts must independently evaluate whether the circumstances bear out the allegation. *Id.* We review a district court's conflict-of-interest determination for an abuse of discretion. *State v. Mulatillo*, 907 N.W.2d 511, 517 (Iowa 2018). We accept the court's factual findings if supported by substantial evidence in the record. *Id.* at 518.

Our review of the record supports the district court's finding that the prosecutor's prior work in the public defender's office did not give rise to a conflict. The public defender's office was involved in the case only briefly at the outset of the prosecution. The prosecutor wasn't assigned to the case and didn't learn any information about Tolbert or the charges. Although the prosecutor was familiar with some potential witnesses, none were called at trial by either party. The prosecutor's information about the witnesses came from other matters. The prosecutor thus did not acquire confidential information based on the public defender's office's brief representation of Tolbert. *See* Iowa R. of Prof'l Conduct 32:1.9(b). And in any event, nothing in the record suggests that the witnesses in question were "material" to Tolbert's case. *Id.*

The district court investigated Tolbert's allegation with some rigor, holding not one but two *Watson* hearings to examine different facets of the alleged conflict. From our review, its conclusions were well-founded in fact and law. We observe no abuse of discretion in its denial of the motion to disqualify counsel.

We thus affirm Tolbert's conviction for second-degree murder.

**Affirmed.**