# IN THE COURT OF APPEALS OF IOWA

No. 14-1646
Filed January 27, 2016

**JESSE EDWARD BROWN,**
        Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Scott County, Mark J. Smith,
Judge.

        Jesse Brown appeals from the denial of his application for postconviction
relief, asserting his trial counsel provided ineffective assistance.  **AFFIRMED.**

        Thomas J. O'Flaherty of O'Flaherty Law Firm, Bettendorf, for appellant.

        Thomas J. Miller, Attorney General, and Kevin Cmelik and Louis S.
Sloven, Assistant Attorneys General, for appellee State.

        Heard by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**DOYLE, Judge.**

Jesse Brown appeals from the denial of his application for postconviction relief, asserting the court erred in not finding his trial counsel was ineffective. We affirm.

### I. Background Facts and Proceedings.

In January 2007, Jesse Brown was charged with first-degree kidnapping and second-degree sexual abuse after he forced his estranged wife Michelle[1] and others into Michelle's vehicle and ordered her, at knife point, to drive around. They eventually ended up at a motel, where Jesse had sexual intercourse with Michelle. Trial in the matter was held in July 2007, and Jesse was ultimately found guilty of both charges. Jesse was sentenced to life imprisonment,[2] and we affirmed his convictions on direct appeal. *See State v. Brown*, No. 07-1479, 2008 WL 5235495, *3 (Iowa Ct. App. Dec. 17, 2008).

In 2009, Jesse filed an application for postconviction relief (PCR), later amended in 2012. Among other things, he asserted ineffective-assistance-of-counsel claims, arguing his trial counsel was ineffective in (1) "not pursuing a defense based on diminished responsibility" because Jesse was previously diagnosed with bipolar disorder and was not taking his prescribed medications, and (2) in admitting Jesse's guilt to the jury without obtaining Jesse's consent.

---

[1] Michelle and Jesse Brown have since divorced, and Michelle is now known as Michelle Stewart. For clarity, we will hereinafter refer to the defendant and the victim by their first names, "Jesse" and "Michelle."

[2] The sex-abuse conviction merged with the first-degree-kidnapping conviction at the time of judgment and sentencing, so no sentence was imposed for the sex-abuse conviction.

Both Jesse and his trial counsel testified at the PCR hearing. Jesse's application was denied by the PCR court.

Jesse now appeals, reasserting his claims that his trial counsel provided ineffective assistance when counsel (1) "failed to recognize [his] bipolar affective disorder was a defense supporting diminished responsibility" and (2) "conceded guilt, arguing to the jury for conviction and punishment of [him] for being 'a bad man.'" We address his arguments in turn, setting forth below additional facts as relevant to the issues raised on appeal.

## II. *Standard of Review.*

We conduct a de novo review of applications for postconviction relief raising constitutional infirmities, including claims of ineffective assistance of counsel. *See State v. Thorndike*, 860 N.W.2d 316, 319 (Iowa 2015).

## III. *Discussion.*

To prevail on a claim of ineffective assistance of counsel, Jesse must prove both that (1) his counsel failed to perform an essential duty and (2) he suffered prejudice as a result of his counsel's failure. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Dempsey v. State*, 860 N.W.2d 860, 868 (Iowa 2015). "We can resolve ineffective-assistance-of-counsel claims under either prong of the analysis." *State v. Ambrose*, 861 N.W.2d 550, 556 (Iowa 2015). We elect to decide this matter on the second prong, under which Jesse has to establish his "counsel's errors were so serious as to deprive [him] of a fair trial." *See id.* He must prove "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different."  *Id.*  A mere showing that the error conceivably could have influenced the proceeding's outcome is not sufficient.  *See id.*

### A.  *Diminished Responsibility.*

Jesse first argues his trial attorney was ineffective for not recognizing "bipolar affective disorder was a defense supporting diminished responsibility, available under Iowa law at the time of trial."  However, Jesse has failed to demonstrate the result of the proceeding would have been any different but for counsel's alleged error.  *See Thorndike*, 860 N.W.2d at 320; *Ambrose*, 861 N.W.2d at 556.

While a bipolar diagnosis may support a diminished-capacity defense as Jesse indicates, the diagnosis by itself is not a defense.  Rather, as the Iowa Supreme Court has recognized, the diminished-responsibility defense "permits proof of defendant's *mental condition on the issue of defendant's capacity* to form a specific intent in those instances in which the State must prove defendant's specific intent as an element of the crime charged."  *Lamasters v. State*, 821 N.W.2d 856, 869 (Iowa 2012) (emphasis added).[3]  The defense "allows a defendant to negate the specific intent element of a crime *by demonstrating* due to some mental defect [he] did not have the capacity to form that specific intent."  *Anfinson v. State*, 758 N.W.2d 496, 502 (Iowa 2008) (emphasis added).  That a

---

[3] The phrase "specific intent" designates a special mental element the State is required to prove above and beyond the intentional nature of the criminal act.  *See State v. Neuzil*, 589 N.W.2d 708, 711 (Iowa 1999).  The definition of kidnapping requires proof the defendant either confined the victim or removed the victim from one place to another, without consent, and with the intent to do one or more of the following: (1) hold the victim for ransom, (2) use the victim as a hostage or shield, (3) inflict serious injury or subject the victim to sexual abuse, (4) secretly confine the victim, or (5) interfere with the performance of a government function.  Iowa Code § 710.1 (2005).  The crime is enhanced to first degree if the victim, as a result of the confinement or removal, suffers serious injury or is intentionally subjected to torture or sexual abuse.  *Id.* § 710.2.

defendant has a mental diagnosis by itself is not enough to warrant assertion of an insanity or diminished-capacity defense; it must be proven the defendant lacked the capacity to form the requisite intent based upon the mental diagnosis. *See State v. Jacobs*, 607 N.W.2d 679, 685 (Iowa 2000).

Here, there is no evidence beyond Jesse's self-serving statements that his bipolar diagnosis prevented him from forming the requisite intent. The PCR cases relied upon by Jesse in support of his claim are distinguishable, in that there was expert testimony or specific evidence presented at the PCR hearing concerning the defendant's mental health and its relation to his defense. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("The mitigating evidence counsel failed to discover and present in this case is powerful."); *Orme v. State*, 896 So. 2d 725, 734 (Fla. 2005) (noting one of Orme's doctors testified at the PCR hearing "that if he had received this type of information prior to trial, he would have diagnosed Orme as probable bipolar in a depressed phase" and "if he had made this diagnosis, he would then have been able to link Orme's major mental illness to his drug addiction," an issue relevant to Orme's defense); *Anfinson*, 758 N.W.2d at 504 ("Expert and lay testimony presented by Anfinson at the [PCR] trial clearly suggests trial counsel could have developed strong evidence detailing the nature and extent of Anfinson's depression and provided an explanation for her bizarre behavior on the day of Jacob's death."); *see also Lamasters*, 821 N.W.2d at 868-69 (finding Lamasters failed to establish his counsel was ineffective in not pursuing an insanity or diminished-capacity defense noting, among other things, that no expert had opined that Lamasters was legally insane at the time of the killing, nor had Lamasters offered an expert

opinion relating to diminished responsibility). To obtain the relief Jesse requests, it is necessary for him to allege what the expert testimony would have been. *See Dunbar v. State*, 515 N.W.2d 12, 15 (Iowa 1994). Even if Jesse's attorney had offered expert testimony in support of a diminished-responsibility defense, there is no reasonable probability the outcome would have been different because the evidence of guilt was overwhelming. Thus, we conclude Jesse failed to establish he was prejudiced by counsel's alleged breach. We agree with the PCR court that Jesse failed to prove his ineffective-assistance-of-counsel claim. Consequently, we affirm on this issue.

### B. Concession of Guilt.

Jesse next argues his trial counsel rendered ineffective assistance because counsel "conceded guilt, arguing to the jury for conviction and punishment of [him] for being 'a bad man.'" To put Jesse's claim in context, we start with parts of the opening arguments given by both the prosecutor and Jesse's trial counsel. First, in his opening statement, the prosecutor explained the charges against Jesse and the facts the State had to prove for the jury to find Jesse guilty of the offenses:

> [Jesse] has been charged with kidnapping in the first degree and sexual abuse in the second degree. Kidnapping, in Iowa . . . essentially involves the holding of another against their will with the intent to commit sex abuse or the intent to commit serious injury. And I believe the evidence will show that both elements of intent are present in this case. . . .
> . . . .
> On . . . November 27th, [2006], Michelle . . . was living apart from [Jesse]. Michelle has six children, some of which are [Jesse's]. And she's going to testify regarding their relationship and the threats that had been persistent in their relationship, the fear that she had, and the fear and the threats to the extent where finally Michelle . . . is living with her grandmother . . . in . . . Illinois.

. . . .

And Michelle will testify . . . Jesse . . . came out of the darkness, grabbed Michelle, forced her back into [her grandmother's] house, forced [Michelle's grandmother] back into the house, and at knife point threatened . . . both of them, with their lives, and took them at that point on a car ride. Forced them into the car, forced the six children, forced the grandmother, . . . and forced Michelle . . . into their vehicle, and told them where to drive.

. . . Now, at some point during this driving around, [Jesse] agreed to drop off [Michelle's grandmother] at home.

. . . .

In the meantime, Jesse . . . forced Michelle to drive the vehicle over the bridge into [Iowa]. . . .

. . . [Jesse] eventually instructed them to go to [a motel]. They rented a room . . . and checked in . . . . During the night—or actually by that time it's morning, at one point Jesse . . . forces Michelle . . . to have intercourse in this room. Shortly after that, they turn on the television and see on the news that it had been reported that they are missing, that the police are looking for them, and Jesse . . . decides to get them all out of there.

. . . [T]he clerk at the [motel] . . . saw on the television that Michelle and the family had been taken . . . , and he notified the Bettendorf police department.

. . . [P]olice officers arrived at the [motel], . . . and as Jesse . . . came out with Michelle and the children, Michelle saw the police and yelled help me, and the police were able to apprehend [Jesse].

You're going to hear testimony that they recovered what they refer to as a butterfly knife, a knife the handle flips open, and [Jesse] was then apprehended.

. . . [Y]ou're going to hear [Jesse's interview with law enforcement wherein Jesse] admits to forcibly taking the family from the home in Silvis, he admits to having a knife, he admits to using a knife, but he denies that the sexual act was without consent.

Thereafter, Jesse's trial counsel gave the following opening statement:

[M]embers of the jury, this is the point during the trial where if this were the movie *My Cousin Vinny*,[4] which some of you may have seen, is the defendant's attorney's time to stand up and say everything [the prosecutor] just said is nonsense. During a typical trial in this courtroom, it would be the time for the defense attorney

---

[4] For information on *My Cousin Vinny*, see *My Cousin Vinny*, IMDb, http://www.imdb.com/title/tt0104952/ (last visited Jan. 15, 2016), or *My Cousin Vinny*, http://en.wikipedia.org/wiki/My_Cousin_Vinny (last visited Jan. 15, 2016).

to stand up and say my client is pure as the driven snow and innocent and not guilty of anything. You don't have any evidence, you've got the wrong guy, he was [in] another state, in another city at the time the crime was alleged to have been committed.

Ladies and gentlemen, I can't say that because it's not true. *Jesse . . . is guilty*. The question is, the fighting issue in this case, is *what is Jesse . . . guilty of*?

[The prosecutor] and I both discussed jury instructions. This is the situation in which you don't actually get to see the instructions until the judge issues them at the close of all the evidence in the case. But one of the concepts he's going to talk to you about, the judge, is elements of an offense. And he'll tell you that the State of Iowa has to prove each and every element of each and every offense charged in the Trial Information in order for you to find an accused person guilty. They give you a summary of the elements, of kidnapping in the first degree as charged in the Trial Information. Again, [the prosecutor] is accurate. Essentially, you're taking someone against their will from one place to another or confining that person against their will, coupled with a couple of things that the evidence is not going to show you in this case.

First of all, with the specific intent, that is the specific positive mindset either to commit an act of sexual abuse or to inflict serious injury, coupled with either a resulting serious injury or an act of sexual abuse. In this case, [Jesse] and I urge that the evidence will fall far short of this jury being able to find those two things. Number one, the specific intent to commit sexual abuse or inflict serious injury, or (b) a result of either serious injury or sexual abuse.

Jesse . . . snapped that night. He did a bad thing. He made a series of poor choices for which he must be held accountable. And we don't deny that. But he should not be held accountable for more than he actually did. And that's where we want you and why we want you to focus your attention carefully not only on all the testimony that you hear, but all of the nontestimonial physical evidence.

There was a sex act between Jesse and Michelle that night or early morning. It was not an act of sexual abuse. The evidence will not show that there was any physical evidence during an examination of Michelle . . . that would suggest any abusive sex took place. I don't think the evidence is going to show you that at any time Michelle . . . suffered serious injury. And since there was no evidence of sexual abuse, and there was no evidence of serious injury resulting to Michelle . . . or anyone else during the course of the late evening, early morning hours, [Jesse] should not be held accountable either for . . . first-degree kidnapping under count 1 . . . or at all under count 2, sexual abuse in the second degree, because the proof simply isn't there. That's why we want your attention to the witnesses, to the physical evidence.

It may surprise you to hear a defense lawyer stand up and say my client is guilty, but he is. And it's your job to determine what the State has proven beyond a reasonable doubt Jesse . . . is guilty of. Thank you, ladies and gentlemen.

(Emphasis added.)

Jesse's video-recorded interview with a law enforcement officer was played for the jury during trial.[5] In the interview, the officer asked Jesse what happened that night, and Jesse responded, "I just snapped." He explained:

> Michelle's been telling me this, "We're gonna be together, we're gonna be together," and I mean, I text her several times about divorce, and she says, "No, I love you," this, that, and the other. And she said, "She's gonna get a place, she's gonna get a place," and I just snapped.
> . . . .
> Man, I have bipolar disease and uh, I do uncon—impulsive, stupid things, man. I mean.
> . . . .
> I just—She's always . . . saying, well we're gonna get, you know, she's gonna get a place, we're gonna get a place, we're gonna get a place. And then, it's like, you know, I keep asking when. She plays these little games by not letting me see my kids, and she let me see my kids when it's convenient to her. And then she has three days off, and I asked her [to see] the kids once a week, you know—and that's not much to ask. And then she throws this big 'ol fit, and this, that, and the other, and she won't let me see my kids or anything else. I just snapped, man.

Jesse admitted he pushed Michelle that night into a kitchen counter. He also admitted he had a knife and threatened Michelle with it, including threatening to kill Michelle, but he told the officer he had no intentions to hurt her—just to scare her. The officer asked what happened when they got to the hotel room, and the following exchange occurred:

---

[5] Because Jesse's interview was not transcribed, we rely on our own opportunity to listen to the recordings in our quoting of the statements in the recordings. We have omitted the short, non-substantive responses given by the officer in response to Jesse's statements in parts of the recording.

[JESSE]: We set down, talked for a few minutes, then we went to bed.

[OFFICER]: Okay. Did you guys get it all aired out?

[JESSE]: No. She didn't want to talk. Said, "I don't want to talk. I'm tired. I don't want to talk right now."

[OFFICER]: Okay.

[JESSE]: [Unintelligible], I mean, we didn't have forceful sex, man. You can ask her, it was mutual. We had sex this morning, I mean, that was it. I didn't rape her or nothing like that, man.

[OFFICER]: You guys had mutual sex?

[JESSE]: Mutual sex. She—I didn't get on top of her. I didn't tell her this, that, and the other; I didn't rape her or nothing like that, I mean. Then she said she loved me this morning after we had made intercourse. I mean, it wasn't like I sexually raped her or nothing like that, but I'm just saying.

[OFFICER]: Okay. She's saying a little different.

[JESSE]: Alright, what's she saying?

[OFFICER]: Well, she's saying, that yeah, there was sex, but she didn't necessarily want to have it.

[JESSE]: Oh, that's bullshit.

[OFFICER]: Did you threaten her at any time during that period?

[JESSE]: No.

. . . .

[OFFICER]: Did you guys have any violence at the hotel?

[JESSE]: No.

[OFFICER]: Were you still threatening her with the knife?

[JESSE]: No.

[OFFICER]: Did you still have the knife?

[JESSE]: Yeah. It was in my pocket, but I mean—

[OFFICER]: Was it out?

[JESSE]: No.

[OFFICER]: No? Okay. Um, no slapping, pushing, hitting—nothing like that at the hotel?

[JESSE]: Screaming.

[OFFICER]: Screaming? Okay. How long were you guys there at the hotel? Before you guys went to bed?

[JESSE]: Probably about an hour.

Before the case was submitted to the jury, Jesse's trial counsel gave the following closing statement, set forth in relevant parts, including the State's objection during his closing:

[JESSE'S TRIAL COUNSEL]: I told you at the outset that I cannot stand here as [Jesse's] attorney and tell you he is an

innocent man and the State can't prove that he did anything wrong. I'm not going to change my position now that all of the evidence is before you. I'm not going to spend almost a full day selecting an intelligent, common sense jury and then try to pull the wool over your eyes and treat you as stupid human beings.

. . . .

With respect to count 1, the first-degree kidnapping, element one, . . . is pretty much not in dispute. There's no doubt in anybody's minds on November 28th [Jesse] confined Michelle . . . and moved her to . . . Iowa. The evidence shows that happened. [Jesse] admits to it.

Element number two requires the State to prove in the alternative that there was a specific intent to commit serious—or to inflict serious injury, subject Michelle to sexual abuse, or to secretly confine Michelle. . . . [S]pecific intent is a little bit difficult to prove. You have to look at all the facts and circumstances in order to determine what's going on in someone's mind. You generally do that by looking at the actions of a particular individual.

. . . .

Let's look at specific intent again. Again, over a period of four years there were threats to kill. They were never carried out. Focusing on several hours of November 28th of 2006, there were again numerous threats to kill. . . . But was there specific intent to commit a serious injury at any time? No serious injury was committed. So there, again, how do you determine what an individual's specific intent is?

I talked about that at the end of my cross-examination to Michelle . . . . I'm standing here, I obviously have the physical ability to use this knife, this knife is a dangerous weapon, it's got a nice long sharp blade, and if I want to kill you with it, I can do that. But Michelle . . . suffered no serious injury, and Michelle . . . is, of course, alive. Why is that true? Why was she not seriously injured when an individual who possessed an instrument which could certainly have caused serious injury, certainly killed? And the answer to that is because he didn't have the specific intent to do that. Had he wanted to do that, had he wanted to hurt her seriously, had he wanted to kill her, she would have either been hurt seriously or killed. There was no specific intent to inflict a serious injury.

With regard to the second alternative, subject Michelle . . . to sexual abuse, I would suggest to you that the sex act that occurred in the [Iowa motel] was separate and apart from the removal of Michelle . . . from Illinois, this drive throughout rural Illinois and ending up in the motel room. . . . [T]here's no evidence at any time up until the sex act occurred that there was any intent on [Jesse's] part to perform a sex act. He wanted money, he wanted to scare her, he wanted to manage the relationship with his wife the way he

had managed it over the course of two marriages over the course of two years. *He did so in a manner society simply can't tolerate, and he's got to be punished for that conduct. He's got to be punished only for the conduct that he actually committed.* So at least with respect to the removal, there's no evidence—there's evidence of a sex act, but there's no evidence that he ever intended to sexually abuse Michelle . . . at any time prior to the actual sex act.

. . . .

Third element, I agree with [the prosecutor] that [Jesse] did not and knew he did not have the consent or authority of Michelle . . . to remove her from her home and transport her anywhere. Her presence in that car that night was clearly involuntary.

And then finally the [State] must prove as a result of the confinement or removal Michelle . . . was sexually abused. . . .

I want you to take a look at Instruction No. 9. The [court] has instructed you on all of the law that applies to this case, and I suggest the crime of false imprisonment is the crime that [Jesse] actually committed. He intentionally confined Michelle . . . , we know that. Michelle . . . was confined against her will, we know that. And he didn't have a reasonable belief that he had a right or authority to confine her. That, members of the jury, is exactly what Jesse . . . did. It's a crime. *For that crime, he must be punished.* And when you return a verdict based on evidence that has been proven beyond a reasonable doubt, that [Jesse] is guilty of false imprisonment, an included offense under count one*, I can assure that you that the [court] stands ready and willing and able to punish him for that conduct.*

[THE STATE]: Your Honor, I object to the reference as to punishment.

THE COURT: The objection is sustained. The jury will disregard any references to punishment.

[JESSE'S TRIAL COUNSEL]: With respect to count 2, the State essentially has to prove not just a sex act, but sexual abuse. Now, let's look at the circumstances of the sex act itself as testified to by Michelle . . . . Again, no evidence that you know—I'm going to kill you if you don't have sex with me or any such thing, that was all related to the removal and the money. If I recall her testimony accurately, she was allowed to go to sleep. Another time, by the way, had Jesse . . . wanted to kill her or seriously injure her, he could very easily have done so because she was sleeping at the time.

She awoke to find [Jesse's] fingers in her vaginal area. She said nothing to him to indicate that his advances were not welcome. Further sex occurred. Incidentally, either of those, use of the finger or use of the penis constitute a sex act in the state of Iowa. He

again met with no resistance. If it's true that in Michelle's mind she was only having sex with Jesse . . . because she feared for her life, because of physical violence and because of threats to maim or kill, that during the sex act was never communicated to Jesse . . . . There's no suggestion that Jesse said anything. The knife was in his pocket at the time, in an article of clothing that we can reasonably assume he wasn't wearing at the time of the act. So although she may have believed that her consent was totally involuntary, Jesse . . . would have had no way of knowing that. He believed, whether rightly or wrongly, that his advances were welcome. Michelle . . . believed otherwise, but again, that was not communicated.

. . . .

Jesse . . . made a statement to the police. . . . Right at the beginning . . . , he was advised that he did not have to make a statement. You have the right to remain silent. . . .

. . . But he wanted to. He wanted to give the police department his side of the story. And he admitted the commission of a crime. He had a knife, he displayed a knife, and he forced Michelle . . . and a whole bunch of other people to get into the car. He didn't have [Michelle or Michelle's grandmother's] permission to do that. He didn't have anyone's permission to keep them. He told you from his perspective what occurred, and what he did was basically admit to a couple of crimes—*or admit to at least one crime, and that's the crime of false imprisonment. And he's guilty of that and he should be held by you accountable for that by your verdict of guilty.*

Under count 2, [the prosecutor] flies by all of the included offenses and says well, we got a clear-cut case beyond a reasonable doubt of sexual abuse in the second degree. There is insufficient proof to convince reasonable people beyond a reasonable doubt that it was other than a sex act, at least as intended by Jesse . . . . But he did some other things during the course of that situation, actually over the course of the evening. He committed acts of assault. Physical contact which was intended to be insulting and injurious to another person. He did that. He's guilty of it, and I can't stand here, and I won't stand here, trying to persuade you otherwise.

. . . .

[The prosecutor] dramatically plays a clip from [Jesse's] statement. And he tells you what Jesse . . . says when the police officer isn't there, the tape is still running. He says—if I recall what he says Jesse . . . said, something to the effect of I should have killed that bitch. What I heard was I'm going to kill that bitch. I swear to God I'm going to kill her. Same thing he's been saying since 2002 and not meaning.

. . . .

Ladies and gentlemen, Jesse . . . is a bad man. Jesse . . . committed a couple of crimes. You should hold Jesse . . . accountable by your verdict of guilty, but not to kidnapping in the first degree, because the elements have not all been proven beyond a reasonable doubt; and not to second degree sexual abuse because not all of the elements of that crime have been proven beyond a reasonable doubt. But in the instructions the court gives you some alternatives. You don't just have to say well, we're pretty frustrated because we don't want to let Jesse . . . go, but we can't find him guilty under the main charges in this case because the evidence just isn't there. Look at the included offenses, that's why they're there. You can go right down the list until you find what the State has proven Jesse . . . did and has proven beyond a reasonable doubt, and that is your just and fair verdict.

Thank you, ladies and gentlemen.

(Emphasis added.)

On appeal, Jesse contends his counsel's statements and strategy arose from "not having prepared a substantive defense before trial."[6] He asserts his counsel's admission to guilt on lesser-included offenses, misdemeanor offenses as opposed to the charged felony offenses, "stripped away the presumption of innocence and removed the consideration of general acquittal from the jurors' minds." We disagree.

Again, starting from the competent-performance-by-counsel presumption, we "proceed to an individualized fact-based analysis." *Lamasters*, 821 N.W.2d at 866. We note that ineffective assistance is less likely to be found where counsel's alleged actions or failures to act are attributed to the exercise of

---

[6] At the PCR hearing, Jesse asserted he did not know what his counsel's theory of defense was or what he was going to say to the jury. Jesse claimed his trial counsel did not visit with him about these issues. Asked if he discussed his tactical decisions with Jesse, trial counsel testified, "It's my long-time practice and habit to make a client aware of the approach I'm going to take in front of a jury. And to more specifically answer your question, I don't have any specific recollection." With regard to this issue, the PCR court found "the testimony of defense counsel credible when he indicated during the hearing on this matter that his usual practice is to tell the defendant he intends to admit to lesser-included offenses as a trial tactic."

counsel's judgment, as is the case here, and a defendant making such claims bears a heavy burden. *See id.* If we find trial counsel made "a reasonable tactical decision," including counsel's selection of the theory of the defense, we will not second-guess the decision. *See id.* Failed trial strategies, tactics, and even mistakes in judgment do not automatically amount to ineffective counsel. *See id.* Moreover, even if Jesse establishes his counsel made a "professionally unreasonable error," he must still affirmatively prove, as noted above, but for counsel's errors, there is a reasonable probability the result of the proceeding would have been different. *See id.* Jesse has not met this burden.

Here, Jesse was read his *Miranda* rights[7] and agreed to talk to the officer, wherein Jesse voluntarily admitted his own guilt on several fronts. Jesse's trial counsel testified at the PCR hearing:

> . . . [T]his would have been the type of case where I would have felt foolish arguing that he had done absolutely nothing wrong. The evidence against him was—including his own admissions, the testimony of the victim in this case, it would have been a very poor trial strategy to attempt to persuade the jury that he simply was not involved in any criminal undertaking.

Clearly, trial counsel's determination in conceding Jesse was guilty of the lesser-included-misdemeanor offenses was trial strategy. Though the strategy was not successful, it was justifiable and within the range of normal competency. *See Anfinson*, 758 N.W.2d at 501; *Pettes v. State*, 418 N.W.2d 53, 57 (Iowa 1988). As one court aptly stated: "[L]awyers are not miracle workers. Most convictions

---

[7] In *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), the United States Supreme Court held that a suspect subjected to custodial interrogation must be warned of "the right to remain silent," anything said "can be used against [the suspect] in a court of law," "the right to the presence of an attorney," and if the suspect "cannot afford an attorney one will be appointed . . . prior to any questioning" if so desired.

follow ineluctably from the defendants' illegal deeds." *United States v. Farr*, 297 F.3d 651, 657-58 (7th Cir. 2002). We will not "assume the role of Monday morning quarterback in condemning counsel's judgment in choosing between what are frequently equally hazardous options available to him." *Anfinson*, 758 N.W.2d at 501; *see also* Greta Van Susteren, *Responsibility of A Criminal Defense Attorney*, 30 Loy. L.A. L. Rev. 125, 126 (1996) ("The convicted prisoners' standard for effective assistance of counsel is usually equal to a miracle worker—in other words, a standard that cannot be met by mere mortals . . . . Clients have been known to demand that their lawyers make a silk purse out of a sow's ear."). Jesse has failed to show his trial counsel breached his duty in adopting this trial strategy, and he has not proven the outcome of his case would have been any different if trial counsel had not adopted this strategy. We agree with the PCR court that Jesse failed to establish his trial counsel rendered ineffective assistance, and we affirm on this issue.

### IV. Conclusion.

For the foregoing reasons, we affirm the PCR court's denial of Jesse's PCR application.

**AFFIRMED.**