# IN THE SUPREME COURT OF IOWA

No. 18–0677

Filed November 22, 2019

**STATE OF IOWA,**

    Appellee,

vs.

**MIGUEL ANGEL LORENZO BALTAZAR,**

    Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg, Judge.

The State seeks further review of a court of appeals decision reversing the defendant's first-degree murder conviction. **DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED.**

Mark C. Smith, State Appellate Defender (until withdrawal), and Stephan J. Japuntich, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Kyle P. Hanson, Assistant Attorney General, for appellee.

**CHRISTENSEN, Justice.**

We are asked to determine whether engaging in an illegal activity disqualifies a defendant from asserting "stand your ground" justification. The defendant was charged with first-degree murder and asserted the justification of self-defense and defense of others. The district court instructed the jury on the outdated version of justification, and the defendant's counsel did not object. The jury found the defendant guilty of murder, and the district court sentenced the defendant to life imprisonment.

On direct appeal, the defendant raised a claim of ineffective assistance for failure to object to the jury instructions, challenged the sufficiency of the evidence for specific intent, and argued the district court abused its discretion in excluding character evidence of the victim. We exercise our discretion and only address whether trial counsel was ineffective and whether the district court abused its discretion in excluding character evidence of the victim. Upon our review, we conclude trial counsel was not ineffective for failing to object to the justification instruction because engaging in an illegal activity disqualified the defendant from asserting stand-your-ground justification. In doing so, we address the appropriate standard for ineffective-assistance-of-counsel claims based on the failure to preserve jury instruction error. We also conclude the district court did not abuse its discretion in excluding character evidence of the victim because the defendant was unaware of the victim's specific conduct.

### I. Background Facts and Proceedings.

Des Moines police responded to reports of gunshots near Oakland Avenue on July 28, 2017. They found Jeffrey Mercado (Pumba) nonresponsive, convulsing, and covered in blood. Mercado suffered two

gunshot wounds—one to the right side of his back and one to his right buttock.  One bullet punctured both lungs, tore through the ascending aorta, and exited his chest.  The other bullet entered the right buttock and exited his right groin.  Each bullet followed a back-to-front trajectory through his body.  Mercado's wounds were fatal.  He died shortly after arriving at the hospital.  An autopsy determined the cause of Mercado's death was gunshot wound to the back; the manner of Mercado's death was homicide.

Witnesses reported a dark-colored Mitsubishi Eclipse accelerate quickly down Oakland Avenue within seconds of the gunshots.  Des Moines police located a car matching the description, but when officers attempted to make a stop, the car fled.  Following a short pursuit, the suspect car crashed in a residential area.  At that time, police officers noticed two individuals in dark clothing running through backyards.  One individual, Anthony Garcia, was immediately taken into custody.  A K-9 unit picked up the second suspect's tracks.  The K-9 led officers down through a creek bed to a drainage pipe.  That drainage pipe was roughly four feet tall.  The K-9 indicated the suspect's tracks continued into the drainage pipe.  The officers, led by the K-9, climbed into the drainage pipe and proceeded to walk fifty to seventy-five yards into the pipe.  A large cavity was located at the end of this pipe.  There, the officers found the second suspect.  The suspect was taken into custody and identified as nineteen-year-old Miguel Angel Lorenzo Baltazar.

At the scene of the crashed Mitsubishi, officers recovered a handgun no more than fifteen yards behind the car.  On Oakland Avenue, at the scene of the shooting, officers located five brass shell casings on the road.  Microscopic comparison proved the handgun recovered near the car fired all five brass shell casings from Oakland Avenue.  Swabs off the recovered

handgun developed a DNA profile, which was compared to Baltazar's DNA profile. The DNA profile from the handgun was consistent with Baltazar's DNA profile to a statistical probability of 1-in-24 sextillion unrelated individuals.

The State charged Baltazar with first-degree murder in the shooting death of Mercado. He filed a notice of self-defense and defense of others and proceeded to trial on March 26, 2018. A number of responding officers, investigators, and witnesses testified.

Garcia agreed to provide truthful testimony for the State in exchange for a twenty-five-year sentence. Garcia testified to knowing Baltazar for a few years. In the days prior to the July 28, 2017 shooting, Garcia and Baltazar discussed Mercado. Baltazar considered Mercado to be "no good" and "an enemy." Garcia was under the impression Baltazar "had some beef" with Mercado. Before the shooting, Garcia admitted to driving Baltazar around looking for Mercado; they knew Mercado hung out at Oakland Avenue. When questioned about the purpose of locating Mercado, Garcia stated, "To be honest, I thought [Baltazar] was going to fight him." Garcia also knew Baltazar carried a gun "all the time" but never saw him fire one.

On the day of the shooting, Baltazar contacted Garcia requesting he pick him up at the Des Moines Area Community College (DMACC) parking lot. Garcia complied. Around 3:00 p.m., Garcia drove his ex-girlfriend's blue-green Mitsubishi Eclipse to DMACC where he picked up Baltazar. Baltazar had a friend with him, and after taking that friend to the probation office, Baltazar asked that Garcia drive to Oakland Avenue to see if Mercado was around.

En route to Oakland Avenue, Garcia testified Baltazar pulled out a handgun and stated he wanted to look for Mercado. If Mercado was found,

Baltazar said he would "[j]ust beat him up, just get in a fight." As the pair suspected, they located Mercado walking along Oakland Avenue. Baltazar instructed Garcia to stop the car. Relative to the car, Mercado was four to five feet away, near the passenger side of the car, on the sidewalk. Garcia testified Baltazar said to Mercado, "What's up, Pumba? What's up? What's up, dude?" Mercado said nothing and ran away from the car. Garcia then watched Baltazar exit the car, raise his handgun, and shoot at Mercado. Baltazar shot directly at Mercado four to five times. Garcia witnessed one of the bullets hit Mercado, and he watched as Mercado fell to the ground.

Baltazar returned to the car and told Garcia to drive. Although scared, Garcia drove off fast. Baltazar stated, "Man, I shot the mother-fucker. You saw that mother-fucker fall." Baltazar instructed Garcia to drive slowly, so not to attract the attention of other drivers. However, after Garcia spotted the Des Moines police, he panicked. "And that's when I lost control. The car was swerving." Garcia crashed the car in a grassy area near a house. He and Baltazar "bailed out and ran." Garcia ran for a bit but was arrested after he surrendered to Des Moines police. Garcia did not see where Baltazar went; "he just disappeared."

Baltazar testified at his trial. He conveyed a concern for his safety because Mercado had previously threatened him and assaulted members of his family. Baltazar told Garcia to pick him up at school so that he could "confront" Mercado. While Baltazar and Garcia drove to Oakland Avenue, Baltazar denied saying anything. Baltazar admitted he had a handgun on him, but according to his testimony, he put it in the glove compartment until they located Mercado. After they found Mercado, Baltazar grabbed the handgun from the glove compartment and stepped out of the car with it at his side. According to Baltazar, he held the

handgun at his side "to assure [himself] that [he] could talk to [Mercado] and get his attention." Baltazar needed the handgun in case Mercado attacked him the moment he got out of the car. Baltazar said, "Hey, Pumba," to get Mercado's attention without coming off as aggressive. Mercado noticed Baltazar's gun, adjusted his pants, and took two or three steps towards him. Baltazar testified Mercado was wearing nothing more than gym shorts, yet he was concerned Mercado was carrying a knife or a gun. He saw Mercado reach for a black handle or object in his pocket.[1]

Baltazar yelled, "Pumba, we don't need to do this," but Mercado continued advancing toward Baltazar. Fearing for his life, Baltazar brought the gun forward and remembered "taking aim at the ground and pulling the trigger." Baltazar claimed he did not intend to hit Mercado, but he did intend to scare him. When Baltazar looked up, he was "shocked" and "confused" that he hit Mercado. Baltazar reentered the car and told Garcia to drive.

Detective Aaron Entriken of the Des Moines Police Department testified regarding his investigation of Mercado's death. He interviewed Mercado's girlfriend, who was walking behind Mercado when the shooting happened. Mercado's girlfriend indicated to Detective Entriken that Mercado took off running as the shots were fired. She stated the gunfire was very quick.

During trial, Baltazar sought to admit evidence of Mercado's violent disposition. The district court refused to admit two surveillance videos—one depicting a fight at a convenience store the day before Mercado's death and one depicting a fight on Oakland Avenue a few minutes before

---

[1]Des Moines police located a lighter, a phone, and a pair of red-handled channel lock pliers on Mercado's body.

Mercado's death. The district court refused to admit the videos but allowed two detectives to testify about the contents.

Prior to submission of the case—and without objection from Baltazar—the jury was instructed in part,

INSTRUCTION NO. 20

The defendant claims he acted with justification.

A person may use reasonable force to prevent injury to the defendant. The use of this force is known as justification.

Reasonable force is only the amount of force a reasonable person would find necessary to use under the circumstances to prevent death or injury.

A person can use deadly force against another if it is reasonable to believe that such force is necessary to avoid injury or risk to one's life or safety, or it is reasonable to believe that such force is necessary to resist a like force or threat.

The State must prove the defendant was not acting with justification.

INSTRUCTION NO. 21

A person is justified in using reasonable force if he reasonably believes the force is necessary to defend himself from any imminent use of unlawful force.

If the State has proved any one of the following elements, the defendant was not justified:

1. The defendant started or continued the incident which resulted in death.

2. *An alternative course of action was available to the defendant.*

3. The defendant did not believe he was in imminent danger of death or injury and the use of force was not necessary to save him.

4. The defendant did not have reasonable grounds for the belief.

5. The force used by defendant was unreasonable.

. . . .

INSTRUCTION NO. 25

Concerning element number 2 of Instruction No. 21, if a defendant is confronted with the use of unlawful force against him, *he is required to avoid the confrontation by seeking an alternative course of action before he is justified in repelling the force used against him.* However, there is an exception.

If the alternative course of action involved a risk to his life or safety, and he reasonably believed that, then he was not required to take or use the alternative course of action to avoid the confrontation, and he could repel the force with reasonable force including deadly force.

(Emphases added.) The jury convicted Baltazar of first-degree murder, finding the State established beyond a reasonable doubt that the commission of the offense involved a dangerous weapon.[2] The district court sentenced Baltazar to life in prison.

Baltazar appealed his judgment and sentence arguing counsel was ineffective for failing to object to the outdated justification instruction. Baltazar further argued the district court erred in overruling his motion for judgment of acquittal and that the district court abused its discretion in allowing only certain character evidence of the victim. We transferred the case to the court of appeals. The court of appeals determined the district court did not abuse its discretion in excluding the character evidence of the victim and that there was sufficient evidence for the jury to conclude Baltazar acted with specific intent to kill. However, the court of appeals reversed Baltazar's conviction and remanded for a new trial because it presumed the "alternative course of action" instruction was

---

[2]A special interrogatory stated,

Did the State of Iowa establish beyond a reasonable doubt that at the time of the commission of the offense the defendant or someone he aided and abetted, represented they were in the immediate possession and control of a dangerous weapon, displayed a dangerous weapon in a threatening manner, or was armed with a dangerous weapon . . . .

The jury answered "yes" to the special interrogatory.

prejudicial and could not "say the record affirmatively establishes the jury would have rejected his justification defense without the erroneous instructions."

We granted the State's application for further review.

## II. Standard of Review.

We have the discretion, when we grant a further review application, to review any issue raised on appeal. *State v. Marin*, 788 N.W.2d 833, 836 (Iowa 2010), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707–08, 708 n.3 (Iowa 2016); *see State v. Effler*, 769 N.W.2d 880, 883 (Iowa 2009) ("[E]fficient use of judicial resources will sometimes prompt our court to rely on the disposition made by the court of appeals on some issues and address only those issues that merit additional consideration."). We exercise that discretion here. We will only address whether trial counsel breached an essential duty and whether the district court abused its discretion by excluding certain character evidence of the victim. The court of appeals decision will stand as the final decision for the remaining issue. *See State v. Walker*, 856 N.W.2d 179, 184 (Iowa 2014); *Marin*, 788 N.W.2d at 836.

We review ineffective-assistance-of-counsel claims de novo. *State v. Ondayog*, 722 N.W.2d 778, 783 (Iowa 2006). "Ineffective-assistance-of-counsel claims require a showing by a preponderance of the evidence both that counsel failed an essential duty and that the failure resulted in prejudice." *State v. Schlitter*, 881 N.W.2d 380, 388 (Iowa 2016).

Rulings on the admission or exclusion of evidence are reviewed for an abuse of discretion. *See State v. Williams*, 929 N.W.2d 621, 628 (Iowa 2019).

**III. Analysis.**

**A. Ineffective Assistance—Jury Instruction on Justification.**
The Sixth Amendment to the United States Constitution and article I, section 10 of the Iowa Constitution guarantee the right to "effective" assistance of counsel. *Ondayog,* 722 N.W.2d at 784 (quoting *Powell v. Alabama,* 287 U.S. 45, 71, 53 S. Ct. 55, 65 (1932)). Relying on *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052 (1984), Baltazar claims his counsel failed to object to the justification instruction and prejudice resulted. Baltazar does not suggest the right to effective counsel under the Iowa Constitution should be interpreted differently from its federal counterpart, and we proceed to address his claim under the *Strickland* standard. *See Ondayog,* 722 N.W.2d at 784 (applying the *Strickland* standard under both Constitutions).

The *Strickland* standard requires establishment of its two-prong test in order to demonstrate the ineffectiveness of counsel: (1) counsel failed to perform an essential duty, and (2) prejudice resulted from this failure. *State v. Straw,* 709 N.W.2d 128, 133 (Iowa 2006) (citing *Strickland,* 466 U.S. at 687–88, 104 S. Ct. at 2065). Failure to prove either prong is fatal to an ineffective-assistance-of-counsel claim. *State v. Liddell,* 672 N.W.2d 805, 809 (Iowa 2003).

Under the first prong, we presume the attorney competently performed his or her duties. *State v. Ross,* 845 N.W.2d 692, 698 (Iowa 2014). A defendant must rebut the presumption of competence by showing a preponderance of the evidence that "trial counsel's 'representation fell below an objective standard of reasonableness.' " *Ondayog,* 722 N.W.2d at 785 (quoting *Strickland,* 466 U.S. at 688, 104 S. Ct. at 2064). "Counsel breaches an essential duty when counsel makes such serious errors that counsel is not functioning as the advocate the

Sixth Amendment guarantees." *Ross*, 845 N.W.2d at 698. This is more than a showing that a trial strategy backfired or that another attorney would try the case differently. *Id.*

To establish prejudice under the second prong, "a defendant must show a reasonable probability that the result of the trial would have been different." *State v. Ambrose*, 861 N.W.2d 550, 557 (Iowa 2015). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ondayog*, 722 N.W.2d at 784 (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068).

1. *Essential duty.* Baltazar argues his counsel breached an essential duty by not objecting to the outdated justification instruction when he asserted the justification of self-defense and defense of others. *See* Iowa Code §§ 704.1, .3 (2018). He contends the outdated instruction negated his justification claim by stating an alternative course of action was available.

Justification is a statutory defense that permits a defendant to use reasonable force to defend himself or herself. *State v. Stallings*, 541 N.W.2d 855, 857 (Iowa 1995). "A person is justified in the use of reasonable force when the person reasonably believes that such force is necessary to defend oneself or another from any actual or imminent use of unlawful force." Iowa Code § 704.3.

The Iowa legislature defined "reasonable force" in 1978 when it adopted the Iowa Criminal Code. *See* 1976 Iowa Acts. ch. 1245, ch. 1, § 401 (codified at Iowa Code § 704.1 (1979)). We noted the 1978 revision was "primarily a restatement of prior law." *State v. Delay*, 320 N.W.2d 831, 834 (Iowa 1982). In 1981, the Iowa legislature amended "reasonable force" and defined it as

that force and no more which a reasonable person, in like circumstances, would judge to be necessary to prevent an injury or loss and can include deadly force if it is reasonable to believe that such force is necessary to avoid injury or risk to one's life or safety or the life or safety of another, or it is reasonable to believe that such force is necessary to resist a like force or threat. Reasonable force, including deadly force, may be used even if an alternative course of action is available if the alternative entails a risk to life or safety, or the life or safety of a third party, or requires one to abandon or retreat from one's dwelling or place of business or employment.

1981 Iowa Acts. ch. 204, § 2 (codified at Iowa Code § 704.1 (1983)). This remained the definition of "reasonable force" for thirty-five years. In 2017, the Iowa legislature deleted the alternative-course-of-action language and added the stand-your-ground provision:

A person who is not engaged in illegal activity has no duty to retreat from any place where the person is lawfully present before using force as specified in this chapter.

2017 Iowa Acts. ch. 69, § 37 (codified at Iowa Code § 704.1(3) (2018)). The amendment took effect July 1, 2017, prior to Mercado's death. *See* Iowa Code § 3.7(1). Despite the legislature's removal of "alternative course of action," the district court instructed the jury with an outdated version of section 704.1 by stating Baltazar was "required to avoid the confrontation by seeking an alternative course of action before he [was] justified in repelling the force used against him."

Baltazar now contends the 2017 amendment eliminated his statutory duty to retreat—a benefit he did not receive under the outdated jury instructions. Because the jury was not instructed on the stand-your-ground provision of section 704.1(3), he asserts trial counsel was ineffective, warranting retrial.

The State contends the 2017 amendment changed—but did not eliminate—the duty to follow an alternative course of action. According to

the State, like the former version of the statute, the current statutory language implies a duty to retreat.

Prior to adoption of the Iowa Criminal Code, Iowa caselaw recognized an implied duty to follow an alternative course of action. *See State v. Cruse*, 228 N.W.2d 28, 30 (Iowa 1975) ("[H]e must retreat as far as is reasonable and safe before taking his adversary's life, except in his home or place of business[.]"); *State v. Badgett*, 167 N.W.2d 680, 683 (Iowa 1969) (same); *State v. Bennett*, 128 Iowa 713, 715, 105 N.W. 324, 325 (1905) ("The appellant contends that the general rule that a person assaulted must retreat, if he may safely do so before taking the life of his assailant . . . is not applicable to this case, because the defendant was on his own premises and was therefore not bound to retreat . . . ."); *State v. Jones*, 89 Iowa 182, 187, 56 N.W. 427, 428 (1893) ("If the danger which appears to be imminent can be avoided in any other way, as by retiring from the conflict, the taking of the life of the assailant is not excusable.").

The duty to follow an alternative course of action was impliedly recognized in the 1978 criminal code revision. *See* 1976 Iowa Acts. ch. 1245, ch. 1, § 401 (codified at Iowa Code § 704.1 (1979)). The statute permitted the use of force "necessary to prevent an injury or loss . . . even if an alternative course of action is available if the alternative entails a risk to one's life or safety." *Id.* Therefore, the 1978 language set forth the exception to following an alternative course of action and implied a general duty to follow an alternative course of action if the exception did not apply. *See id.* Caselaw in the years following the 1978 revision continued to recognize that the implied duty to follow an alternative course of action was a disqualifying factor for justification. *See, e.g., State v. Shanahan*, 712 N.W.2d 121, 134 (Iowa 2006); *State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993); *State v. Rupp*, 282 N.W.2d 125, 127 (Iowa 1979).

We agree the 2017 amendment changed—but did not eliminate—the implied duty to follow an alternative course of action. If there is no duty to retreat when a person is not engaged in illegal activity or lawfully present, then by implication the duty to retreat remains if the activity is illegal or the presence unlawful. *See Kidd v. Alabama,* 105 So. 3d 1261, 1264 (Ala. Crim. App. 2012) (unlawful possession of firearm was criminal activity that imposed a duty to retreat).

The State contends Baltazar engaged in an illegal activity that disqualified him from asserting the justification of "stand your ground." Specifically, at the very least, Baltazar was engaged in criminal activity by carrying his handgun in public without a permit. *See* Iowa Code § 724.4(1) (2018) (carrying weapons). Baltazar testified he had a handgun on him when Garcia picked him up. Baltazar then kept the handgun in the car while he looked to confront Mercado. After Baltazar directed Garcia to stop the car next to Mercado, Baltazar grabbed the handgun and stepped out of the car with it at his side. Baltazar testified that at the time of this incident, he was only nineteen years old. The State explains an exception to the criminal act of carrying weapons is the existence of a valid permit. *See id.* § 724.4(4)(*i*). However, the State points out that Iowa law prohibits the issuance of a nonprofessional permit to anyone less than twenty-one years old and prohibits the issuance of a professional permit to anyone less than eighteen years old. *See id.* § 724.8(1). Baltazar presented no evidence concerning whether he was in possession of a valid permit, professional or otherwise. In addition, Baltazar armed himself with a handgun with the purpose to track down and confront Mercado. This conduct was likely outside the limits of a valid permit and was likely a violation of other criminal statutes. *See id.* § 724.4(4)(*i*) (carrying weapons permit); *see also id.* § 708.1(2)(*c*) (assault by pointing or displaying a

firearm); *id.* § 708.8 (going armed with intent). Moreover, the jury found Baltazar represented he was "in the immediate possession and control of a dangerous weapon, displayed a dangerous weapon in a threatening manner, or was armed with a dangerous weapon" during Mercado's murder.

It is Baltazar's position the implied duty to retreat involves only illegal activities germane to the use of force. *See id.* § 704.1(3). Baltazar suggests aggressively threatening or assaulting a recipient of violence are such qualifying activities. He claims, however, his possession of a handgun, legal or otherwise, is irrelevant to the justification issue. We disagree with this assertion. Baltazar did not simply possess a handgun in an irrelevant way. He possessed a handgun in a way that is germane to the use of force. Baltazar's own testimony revealed he sought to confront Mercado and he further admitted using the handgun as assurance to talk with Mercado and to get his attention. That handgun, which Baltazar later fired, caused Mercado's death. Even assuming the implied duty to retreat involves only illegal activities germane to the use of force, Baltazar's possession of the handgun was directly related to the shooting death of Mercado. In this case, Baltazar's possession of the handgun was germane to the use of deadly force.

We conclude the record established Baltazar engaged in an illegal activity that disqualified him from asserting his justification. Therefore, he was not entitled to an instruction regarding section 704.1(3)'s stand-your-ground justification. Baltazar's trial counsel did not fail to perform an essential duty by not objecting to the outdated justification instruction. "Counsel has no duty to raise an issue that has no merit." *State v. Fountain,* 786 N.W.2d 260, 263 (Iowa 2010).

2. *Prejudice.* On further review, the State argues the court of appeals incorrectly applied the preserved-error standard, which presumes prejudice. Although we determined Baltazar's ineffective-assistance-of-counsel claim failed to satisfy the essential duty prong, we nonetheless address the appropriate standard under the prejudice prong in an effort to provide guidance for future cases.

The court of appeals concluded, "[W]e cannot say the record affirmatively establishes the jury would have rejected [Baltazar's] justification defense without the erroneous instructions." It is true, of course, that "[e]rrors in jury instructions are presumed prejudicial unless 'the record affirmatively establishes there was no prejudice.'" *State v. Murray*, 796 N.W.2d 907, 908 (Iowa 2011) (quoting *State v. Hanes*, 790 N.W.2d 545, 551 (Iowa 2010)). However, the presumed-prejudice standard applies to preserved errors in jury instructions. *See Hanes*, 790 N.W.2d at 548–49, 553, 555–56 (distinguishing between standards for preserved and unpreserved error).

We again reiterate the rule pronounced in *State v. Maxwell*, that an ineffective-assistance-of-counsel claim based on failure to preserve jury instruction error must demonstrate deficiency and prejudice:

> [I]neffective-assistance-of-counsel claims based on failure to preserve error are not to be reviewed on the basis of whether the claimed error would have required reversal if it had been preserved at trial. Rather, a defendant must demonstrate a breach of an essential duty and prejudice.

743 N.W.2d 185, 196 (Iowa 2008) (citation omitted); *see Ross*, 845 N.W.2d at 697–98 (holding erroneous instruction claim raised in context of ineffective assistance must show failure to perform essential duty and prejudice); *Ambrose*, 861 N.W.2d at 556 (same); *Fountain*, 786 N.W.2d at 263–65 (same); *Ondayog*, 722 N.W.2d at 784 (same).

In this case, Baltazar cannot show a reasonable probability that the outcome of his trial would have been different, and we reject his claim. *See Ambrose*, 861 N.W.2d at 557.

First, applying the new stand-your-ground provision would not have changed the outcome of Baltazar's trial. Because Baltazar engaged in an illegal activity,[3] he had the implied duty to retreat pursuant to the new stand-your-ground provision: "A person who is *not engaged in illegal activity has no duty to retreat* from any place where the person is lawfully present before using force as specified in this chapter." Iowa Code § 704.1(3) (emphasis added).

Secondly, had trial counsel removed the outdated alternative-course-of-action language, Baltazar was still not justified in his use of force if the State proved any of the remaining exceptions:

> 1. The defendant started or continued the incident which resulted in death.
>
> . . . .
>
> 3. The defendant did not believe he was in imminent danger of death or injury and the use of force was not necessary to save him.
>
> 4. The defendant did not have reasonable grounds for the belief.
>
> 5. The force used by defendant was unreasonable.

*See Shanahan*, 712 N.W.2d at 134. Evidence of Baltazar's guilt was overwhelming, disproving any theory of his justification. The evidence proved Baltazar went looking for Mercado so he could confront him. Baltazar knew Mercado hung out at Oakland Avenue. When Baltazar

---

[3]Baltazar's conduct was likely outside the limits of a valid permit and was likely a violation of other criminal statutes. *See* Iowa Code § 724.4(4)(*i*) (carrying weapons permit); *see also id.* § 708.1(2)(*c*) (assault by pointing or displaying a firearm); *id.* § 708.8 (going armed with intent).

spotted Mercado, he ordered Garcia to stop the car next to Mercado.  He then exited the car with his handgun.  Two eyewitnesses observed Mercado running away when Baltazar started shooting at him.  The autopsy confirmed two bullets entered Mercado's body traveling from his back to his front.  The handgun Baltazar used was semiautomatic, requiring he pull the trigger for each of the five shots.  After shooting Mercado, Baltazar returned to the car and commanded Garcia to drive.  Baltazar stated, "Man, I shot the mother-fucker.  You saw that mother-fucker fall." Baltazar then proceeded to run from Des Moines police, following the car crash, escaping down into a creek and wading approximately seventy-five yards into a drainage pipe.  Given this overwhelming evidence, there is no reasonable probability that the result of Baltazar's trial would have been different.

Baltazar cannot show prejudice resulted from his trial counsel's failure to object to the outdated justification instruction.  Accordingly, his ineffective-assistance-of-counsel claim must fail on the second prong of *Strickland* as well.  *See Liddell*, 672 N.W.2d at 809.

**B. Character Evidence of Victim.**  Baltazar asserts the district court erred in excluding two videos depicting Mercado's violent tendencies, resulting in prejudice to his self-defense claim.  The district court refused to admit the videos, but allowed the detectives to testify about the contents.  It ruled,

> [The detectives] can say what [they] saw, but I think [the videos are] too prejudicial because it allows the jury to speculate, and it allows also—it's unfair to the State in that it gives you no opportunity to explain those two events whatsoever.
>
> It's confusing to the jury.  It's isolated.  You don't know exactly what was going on, especially when there's no sound to it.  So I have a problem with that.

> However, they can describe what they saw in the video, and say "Yeah, we saw him punching and, therefore, we think he's violent." That's fine.

Baltazar argues the videos were relevant, specific instances of Mercado's conduct and demonstrated his genuine fear of Mercado. Because Baltazar did not know about the prior fights, the State argues the videos were not admissible to prove Mercado's character.

Iowa Rule of Evidence 5.405 is entitled "Methods of proving character" and states,

> *a. By reputation or opinion.* When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion. On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct.

> *b. By specific instances of conduct.* When a person's character or character trait is an essential element of a charge, claim, or defense, the character or trait may also be proved by relevant specific instances of the person's conduct.

In *Williams*, we addressed the uncertainty surrounding the application of rule 5.405. 929 N.W.2d at 634–36. *Williams* held that "a defendant asserting self-defense or justification may not prove the victim's aggressive or violent character by specific conduct of the victim *unless* the conduct was previously known to the defendant." *Id.* at 636.

The rule expressed in *Williams* controls here. Baltazar produced no evidence that he knew about the specific conduct expressed on either video. Because Baltazar is asserting justification, he may not prove Mercado's aggressive or violent behavior through previously unknown specific conduct. *See id.* at 634–37. Therefore, we conclude the district court did not abuse its discretion in excluding the videos.[4]

---

[4]On direct appeal, the court of appeals determined Baltazar was permitted to introduce evidence of Mercado's character, but the district court's exclusion was not an

**IV.  Conclusion.**

We affirm the judgment of the district court.  The court of appeals decision for the sufficiency of the evidence stands as the final decision.  We affirm the court of appeals decision addressing the character evidence for the reasons expressed in this opinion.  However, we vacate the court of appeals decision addressing the ineffectiveness of counsel.

**DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED.**

---

abuse of discretion.  The court of appeals did not have the benefit of our opinion in *Williams* when it concluded character evidence of the victim was permitted.