# IN THE COURT OF APPEALS OF IOWA

No. 21-1508
Filed January 11, 2023

**PETE JASON POLSON,**
　　Applicant-Appellee,

**vs.**

**STATE OF IOWA,**
　　Respondent-Appellant.
_____

　　Appeal from the Iowa District Court for Polk County, Paul D. Scott, Judge.


　　The State appeals the grant of a new trial to a postconviction-relief applicant. **REVERSED AND REMANDED.**

　　Brenna Bird, Attorney General, and Zachary Miller, Assistant Attorney General, for appellant State.

　　Alexander Smith of Parrish Kruidenier Dunn Gentry Brown Bergmann & Messamer L.L.P., Des Moines, for appellee.

　　Considered by Ahlers, P.J., and Badding and Chicchelly, JJ.

**BADDING, Judge.**

On a cold Monday morning in November 2014, Pete Polson went on a random shooting spree in a quiet neighborhood, almost killing two men and narrowly missing another. We affirmed Polson's convictions for these shootings on direct appeal but preserved the following claim for postconviction relief: whether trial counsel was ineffective for failing to retain an expert witness to testify about Polson's "lack of memory and ability to form specific intent several hours after using 'cut' methamphetamine." *State v. Polson*, No. 15-2104, 2017 WL 1401472, at *7–8 (Iowa Ct. App. Apr. 19, 2017). Polson raised that claim in his application for postconviction relief, which the district court granted. We reverse and remand.

## I. Background Facts and Proceedings

Polson spent the weekend before the shootings "slamming"[1] methamphetamine with a woman he had only recently met—Billi Jo Bailey. She testified at Polson's criminal trial that "she saw Polson use methamphetamine a number of times throughout that weekend, with the last time being around 10:30 or 11:00 p.m. on November 16." While it looked the same as other methamphetamine they had that weekend, Polson's behavior was different. So Bailey asked him to leave.

Polson left Bailey's home around midnight. His last memory was the shot of methamphetamine she watched him inject. Polson testified at trial it was new stuff he had just purchased that night after they ran out. He said that right after he injected it, he knew "something was wrong. . . . [I]t didn't even taste like dope,"

---

[1] By "slamming," Polson meant he was heating methamphetamine on a spoon until it became liquid and then injecting it into his veins with a syringe.

which is what he called methamphetamine.  Polson continued: "[W]hen you shoot dope, if it's real good you can taste it," and whether "it's good or not, you feel it, you know.  You get a rush. . . .  You're really energetic and stuff like that."  But with what he took that night, Polson said, "Right when I took the shot [the] back of my neck hair stood up, and I just—I don't know, man. . . .  [A]fter that stuff got weird, and I just don't even remember."

What Polson claims to not remember is shooting at three strangers the next morning, starting around 6:30 a.m.  The first victim was Mark Mitchell, who Polson shot in the stomach as Mitchell was leaving his house to go to work.  The second shooting was called in a few minutes later.  That victim was Zachary Whitehill.  He had pulled over to the side of the road to clear off his windshield when Polson drove up and shot him in the back and neck.  Less than ten minutes later, Polson came upon Matthew Stephenson, his third victim.  Stephenson had just dropped his son's school bag off and was getting back into his truck when Polson started shooting at him.  He took cover, and the bullets missed him by mere inches.

Law enforcement officials found Polson around 7:00 a.m., shortly after the last shooting.  His vehicle was blocked in by two troopers, who ordered him to shut off the car and throw the keys out.  The troopers said that Polson followed all of their commands and was "very compliant."  One described Polson during the encounter as:

> He was very calm.  He was calm throughout the whole thing.  He really had no emotion on his face. . . .  And I believe I remember him when he was in the vehicle asking what was going on, but he didn't seem fearful.  He didn't seem concerned about what was happening.

The other trooper agreed, testifying Polson seemed "indifferent, just normal, like another day."  Neither of those troopers, nor two other law enforcement officials who interacted with Polson that morning, believed he was intoxicated or under the influence of any drug.

Polson was charged with three counts of attempted murder, two counts of willful injury causing serious injury, and intimidation with a dangerous weapon, along with several drug offenses stemming from a large amount of marijuana found at his residence after the shootings.  Law enforcement officials also found spoons on Polson's nightstand with methamphetamine residue, a small glass vial on a coffee table with a crystal residue that was not a controlled substance, and a syringe in a backpack in Polson's vehicle.

Faced with this evidence, Polson's trial attorney explained at the postconviction-relief hearing that "the only defense to the attempted murder charges was that he was not in control of his actions" because of intoxication.  The problem with this defense, according to the attorney, "was the [S]tate's argument that he wasn't acting like one who was on meth."  When confronted with that problem, defense counsel said, "that's when [Polson] mentioned, well, he didn't think it was methamphetamine.  He thought it was something else."  So their argument at trial was that Polson "wasn't acting like somebody on methamphetamine because he was on something else."

Polson's attorney did not secure an expert to testify about this because he knew that he could get the officers to say

> there was this business out there where people would sometimes sell counterfeit substances, and so . . . Mr. Polson would have been able to unknowingly and unwittingly purchase some of that and use

some of that, causing a reaction in him that would look different from somebody else that had actually used methamphetamine.

He felt that using the State's witnesses as experts against them, rather than hiring one of their own, was a good strategy because

> [j]urors are well used to the concept of experts being called, and that you can always get an expert to say anything you want, so to speak, under the theory that they're just bought and paid for and will say what you want them to say. But when you do it with their witness, it has more impact.

This strategy worked, to an extent. The jury found Polson guilty of only one count of attempted murder and two counts of the lesser-included offense of assault with intent to inflict serious injury.[2] On direct appeal, Polson claimed that "trial counsel should have retained an expert witness to testify about the effects of psychotropic drugs." In examining that claim, we concluded:

> While the evidence Polson was the shooter was overwhelming, there was some question as to whether Polson was able to form the specific intent necessary to be convicted of the charges that resulted from the shootings. Based on the record before us, we do not know if there was an expert that could offer the type of testimony that Polson now contends was necessary—testimony that would have buttressed his assertions about his lack of memory and ability to form intent several hours after using "cut" methamphetamine.

*Id.* at *7. So we preserved that claim for postconviction relief. *Id.*

After petitioning for postconviction relief, Polson retained Terriann Crisp, a retired pharmacology professor. Dr. Crisp's review was limited to our decision in Polson's direct appeal, which led her to conclude: "I have no question whatsoever that he was experiencing a methamphetamine-induced psychosis." Because that "causes a dissociation from reality," Dr. Crisp believed it "could certainly affect a

---

[2] Polson was found guilty as charged of the remaining counts.

person's ability to differentiate right from wrong and affect their specific intent to harm others."

The district court found this testimony compelling in concluding that trial counsel's "failure to fully investigate and utilize an expert witness to testify as to Polson's ability to form the specific intent necessary to be convicted of the charges that resulted from the shootings was breach of an essential duty." The court further found that Polson was prejudiced by the error because

> [t]here was an expert that could have offered the type of testimony that Polson contends was necessary. Dr. Crisp's testimony would have buttressed Polson's assertions about his lack of memory and ability to form intent. This testimony shows that the probability of a different result is sufficient to undermine confidence in the outcome of Polson's trial.

The court granted Polson a new trial on all of his convictions.[3]

The State appeals, claiming (1) "[c]ounsel performed effectively by pursuing an intoxication defense consistent with the fact that [Polson] took a drug other than meth before the shooting spree," and (2) the "failure to call an expert on the effects of meth did not prejudice [Polson] because the facts did not support the expert's opinion and she did not understand specific intent."

## II.    Standard of Review

We generally review a district court's ruling on an application for postconviction relief for errors at law. *See Doss v. State*, 961 N.W.2d 701, 709 (Iowa 2021). But because Polson's application alleged ineffective assistance of

---

[3] Polson agrees the court erred in extending its ruling to his marijuana convictions, which were not affected by the lack of an expert witness on his specific intent for the shootings.

counsel, we conduct a de novo review. *Goode v. State*, 920 N.W.2d 520, 523 (Iowa 2018).

## III. Analysis

"The Sixth Amendment to the United States Constitution and article 1, section 10 of the Iowa Constitution guarantee the right to 'effective' assistance of counsel." *State v. Lorenzo Baltazar*, 935 N.W.2d 862, 868 (Iowa 2019). To establish ineffective assistance of counsel, Polson must show by a preponderance of the evidence that his trial attorney "'failed to perform an essential duty' that resulted in prejudice." *Doss*, 961 N.W.2d at 709 (citation omitted); *accord Strickland v. Washington*, 466 U.S.668, 687–88 (1984).

Under the first prong of the analysis, we start with the presumption that counsel "competently performed his or her duties." *Lorenzo Baltazar*, 935 N.W.2d at 868. To rebut this presumption, Polson must show "that trial counsel's representation fell below an objective standard of reasonableness." *Id.* (citations omitted). "This is more than a showing that a trial strategy backfired or that another attorney would try the case differently." *Id.* "[T]o some extent counsel's trial performance must be judged by his primary theory of defense," the selection of which "is a tactical matter." *Schrier v. State*, 347 N.W.2d 657, 663 (Iowa 1984).

The primary defense theory was that Polson was intoxicated by something other than methamphetamine during the shootings, which affected his ability to form the specific intent required for the charges related to the shootings. *See State v. Guerrero Cordero*, 861 N.W.2d 253, 258 (Iowa 2015), *overruled on other grounds by Alcala v. Marriott Int'l Inc.*, 880 N.W.2d 699, 708 (Iowa 2016) (stating intoxication can "be used by a fact finder to consider the ability of a defendant to

form the specific intent necessary to commit a crime"); *see also* Iowa Code § 701.5 (2014). Trial counsel considered whether to call an expert on that issue and elected against it because "the plan was to use the State's witnesses against them." He had found that to be effective in the past, testifying; "Any time you can turn State's witnesses against them, it's helpful to you." Counsel used this strategy to get one of the law enforcement officials involved in the case to agree:

> Q. Some people will ingest things like bath salts; isn't that correct? A. Correct.
> Q. Some of those bath salts will sometimes look like methamphetamine crystals; isn't that correct? A. Correct.
> Q. The report that you went through with Ms. Cox talks about item No. 6 [a glass vial] having a crystalline substance that . . . was not a controlled substance; isn't that right? A. Right.
> Q. But it could be a bath salt? A. The lab didn't tell us what it was.
> Q. Exactly. So it could be? A. Could be something else.
> . . . .
> Q. And sometimes, though, people will use something that will look like meth because they don't have methamphetamine, and they want to get the money from the sale. They use something, a counterfeit substance; isn't that correct? A. Yes.

"There is no bright-line duty for an attorney to retain an expert." *Dawson v. State*, No. 17-1679, 2019 WL 1940727, at *5 (Iowa Ct. App. May 1, 2019). Instead, it is a question of trial strategy. *See Heaton v. State*, 420 N.W.2d 429, 432 (Iowa 1988). Counsel felt the strategy worked here, where "given all of the overwhelming evidence against [Polson], the jury still chose to find him guilty of only one charge of attempted murder as opposed to three." *See Everett v. State*, 789 N.W.2d 151, 158 (Iowa 2010) ("In determining whether an attorney failed in performance of an essential duty, we avoid second-guessing reasonable trial strategy."). When asked whether he could have done both—cross-examined the State's witnesses and retained an expert—defense counsel said: "If it affects

the way the jury looks at the expert and makes them think that he's just a bought and paid for witness, you know, maybe it degrades the look of the police officers to them, as well." This was a reasonable trial strategy. *See State v. Majors*, 940 N.W.2d 372, 392 (Iowa 2020) (finding trial counsel's "strategic decision to rely on his own cross-examination of the State's expert" was a reasonable one).

Polson also failed to prove that he was prejudiced by counsel's decision to forego an expert. To establish prejudice, "a defendant must show a reasonable probability that the result of the trial would have been different." *State v. Ambrose*, 861 N.W.2d 550, 557 (Iowa 2015). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Lorenzo Baltazar*, 935 N.W.2d at 869. That said, the "likelihood of a different result must be substantial, not just conceivable." *Ambrose*, 861 N.W.2d at 557. "This standard requires us to consider the totality of the evidence, identify what factual findings would have been affected, and determine if the error was pervasive or isolated and trivial." *Id.*

Dr. Crisp's description of how a person in a methamphetamine-induced psychosis would act conflicted with the evidence about how Polson acted. She testified that someone who is in a methamphetamine-induced psychosis,

> looks very similar to what schizophrenia looks like. And the patients that I personally have seen in that violent capacity, they aren't holding back at all. So most of the time they'll give them a shot in the emergency room, and it takes four or five men to hold them down because they are so violent. So this is right after . . . they've ingested the amphetamine.

The person's behavior, according to Dr. Crisp, would make "it obvious that they were on methamphetamine."

But multiple law enforcement officials testified Polson displayed no observable signs of intoxication when he was arrested shortly after the last shooting. They described him as "calm," "compliant," "indifferent," "normal," and "lucid." One of those officials, who was trained to recognize signs of methamphetamine intoxication, testified:

> A person's behavior would be very fidgety. They would be moving around a lot. They would be tapping their feet or tapping their leg. They would almost appear shaky. They would be very talkative, very restless. . . . [T]heir pupils would be very dilated, very large. And they may also be sweating. . . .

Polson's ex-girlfriend similarly testified that when he was high on methamphetamine, he was "hyper"; "all over the place"; and unable to "comprehend things" or hold a normal conversation. Polson did not exhibit any of that behavior just after the shootings, which Dr. Crisp recognized was "odd" because she "wouldn't have thought that he could have just been in [the psychosis] and then popped out enough to talk to the police."

The State used the testimony about Polson's normal behavior after the shootings to argue that he was not intoxicated. Defense counsel tried to combat that argument with evidence that whatever Polson took made him act differently than someone on methamphetamine. This tracked Polson's testimony that "something was wrong" with the "last shot" he did the night before. He testified that, in his experience with methamphetamine, sometimes it is "cut" with other substances to "stretch it out to make more money." But Dr. Crisp poked a hole in that theory, testifying: "[N]owhere have I read that the mixes they use enhance . . . the psychoactive effects of the drug." Instead, according to Dr. Crisp,

methamphetamine is usually cut with "stuff that isn't going to make any difference pharmacologically one way or the other."

While Dr. Crisp had "no question whatsoever that [Polson] was experiencing a methamphetamine-induced psychosis," her testimony on whether that affected his ability to form specific intent was more equivocal. Dr. Crisp equated specific intent with a person's ability to engage in "complex cognitive behaviors," which she explained would involve the "ability to look ahead and see what needs to be done" or how to "get from A to Z."[4] She gave the examples of driving a car or getting a gun and hitting a target. According to Dr. Crisp, a person in a methamphetamine-induced psychosis would have a significantly diminished ability to engage in those types of "complex cognitive behaviors." But the morning of the shootings, Polson drove a car and used a gun to shoot at three people, making contact with two. And after the shootings, he fled the scene and threw the gun out the window, again showing he was able to "look ahead and see what needs to be done."

On our de novo review, we conclude the record does not show an expert like Dr. Crisp would have helped Polson's defense. *See, e.g.*, *Babcock v. State*, No. 19-1035, 2021 WL 603229, at *3–4 (Iowa Ct. App. Jan. 21, 2021) (finding counsel was not ineffective where defendant failed to show a defense expert would have helped his defense); *Dawson*, 2019 WL 1940727, at *5 (concluding defendant was not prejudiced by counsel's failure to call an expert pathologist to

---

[4] The jury instruction on specific intent defined the element to mean "not only being aware of doing an act and doing it voluntarily, but in addition, doing it with a specific purpose in mind."

testify on how aggressive a fight was). Polson was therefore not prejudiced by trial counsel's failure to retain an expert.

## IV.    Conclusion

Because Polson failed to prove either a breach of duty or prejudice as required to succeed with his ineffective-assistance-of-counsel claim, we find the district court erred in granting him postconviction relief. We accordingly reverse the court's decision and remand for a dismissal of Polson's application.

**REVERSED AND REMANDED**